| | 1971 | 1972 | 1973 (Dollars) | 1974 | 1975 (Base Year) | Line Item No. |
|---|---|---|---|---|---|---|
| Less: Purchases-Transshipment Market Value (Cost) | $ 7,223 | $ 7,563 | $ 6,909 | $ 3,716 | 0 | 12 |
| Less: Additional Variable Expenses (10.65%) (Reduced by 30% from Exhibit A–30 in Accordance with Adjustment in Lines 4a & 4b above) | $ 1,602 | $ 1,556 | $ 1,579 | $ 1,277 | 0 | 13 |
| NET INCOME LOSS | $ 1,059 | $ 1,216 | $ 1,641 | $ 387 | 0 | 14 |

UNITED STATES of America,
Plaintiff-Appellee,

v.

PROFESSIONAL AIR TRAFFIC CON-
TROLLERS ORGANIZATION, LOCAL
504, Doug Ramsay and Steve Helton,
Defendants-Appellants.

Nos. 81–2145, 81–2146 and 81–2147.

United States Court of Appeals,
Tenth Circuit.

March 21, 1983.

Roger D. Sandack, Salt Lake City, Utah (A. Wally Sandack, Salt Lake City, Utah, with him on brief), Sandack & Sandack, Salt Lake City, Utah, for defendants-appellants.

Anthony J. Steinmeyer, Atty., Appellate Staff, Civ. Div., Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Frederick Geilfuss, Atty., Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., and Brent Ward, U.S. Atty., Salt Lake City, Utah, with him on brief), Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before DOYLE, McKAY and LOGAN, Circuit Judges.

LOGAN, Circuit Judge.

Defendants Professional Air Traffic Controllers Organization Local 504, Local President Doug Ramsay, and Local Vice-President Steve Helton appeal from the district court's judgment holding them in civil contempt for failure to comply with a temporary restraining order issued by the court. The defendants challenge the holding of contempt and the imposition of fines pursuant to the contempt citation.

On August 3, 1981, the Professional Air Traffic Controllers Organization (PATCO) initiated a nationwide strike because of a breakdown of negotiations over a new collective bargaining agreement. Local 504, an affiliate of PATCO based in Salt Lake City, Utah, participated in that strike. The nationwide strike began at 5:00 a.m. Mountain Daylight Time (M.D.T.). At 9:00 a.m. (11:00 a.m. E.D.T.) the President of the United States issued a statement concerning the strike, which provided in part:

"It is for this reason that I must tell those who fail to report for duty this morning they are in violation of the law, and if they do not report for work within 48 hours, they have forfeited their jobs and will be terminated."

Around noon on that same day, the government filed a complaint against PATCO, Local 504, and individual officers and members of Local 504. The government also filed a motion seeking a temporary restraining order against the strike. At approximately 1:30 p.m. the district court issued an ex parte order declaring that the strike was illegal and restraining the defendants from "calling, commencing, causing, authorizing, continuing, encouraging, ordering, aiding, abetting, participating in, engaging in, or taking any part in" the strike. The order also directed the defendants to instruct all PATCO members to resume their normal employment and to inform other officers of PATCO of the restraining order. On August 4, 1981, the court issued an order for the defendants to appear to show cause why a judgment of contempt should not be issued. After hearing evidence from both sides on August 5, the district judge issued a judgment of civil contempt against the defendants, ruling that they were in contempt because they had failed to affirmatively instruct Local PATCO members to resume their normal air traffic controller duties and because the individual defendants had failed to resume their own controller duties. The judge imposed fines of $10,000 a day on Local 504 and $1,000 a day on the individuals, the fines to begin at noon on August 7, 1981 if the defendants were not then in compliance.

On August 5, 1981 Secretary of Transportation Drew Lewis announced that the strike was over. On that same day, William O'Neill, Facility Chief of the Air Route Traffic Control Center at Salt Lake, received a clarification, by GENOT communication, of the President's order, which stated that controllers who did not report for duty by 9:00 a.m. (11:00 E.D.T.) "or at the first shift thereafter to which they are directed or scheduled to report will receive termination notices." R. I, 225. Under the President's deadline as interpreted by the

government, both the individual defendants and a number of other controllers working at the Salt Lake facility could have returned to work after 9:00 a.m. on August 5. Defendant Ramsay's next regularly scheduled shift commenced at 4:00 p.m. on August 6; defendant Helton's next regularly scheduled shift after the President's deadline was 4:00 p.m. on August 7. Some of the other striking workers' regularly scheduled shifts began as late as 4:00 p.m. on August 8.

After a hearing on August 21, 1981, the district court found that the defendants had not purged themselves of contempt. The court directed a judgment of civil contempt against the defendants for failure to comply with the court's orders and assessed fines against Local 504 of $20,000 and against Ramsay and Helton of $2,000. This judgment was finalized on August 31, 1981.

The evidence is clear that the defendants did not comply with the court's August 3 order and hence were in contempt at least until the 9:00 a.m. August 5 deadline established by the President. If they had knowledge of the extension of the deadline for those workers whose next regular shift commenced after the August 5 deadline, the defendants were also in contempt subsequent to August 5 for failure to instruct the members of their union entitled to return to work to do so.

 In civil contempt cases the proof of contempt must be clear and convincing. *Heinold Hog Market, Inc. v. McCoy,* 700 F.2d 611 (10th Cir.1983). Sanctions for civil contempt are imposed to coerce compliance with the court's order. Thus, civil contempt continues until terminated by compliance. *See Shillitani v. United States,* 384 U.S. 364, 368–69, 86 S.Ct. 1531, 1534–35, 16 L.Ed.2d 622 (1966). Because the daily fine imposed here was meant to coerce, its propriety depends upon the ability of the defendants to comply with the court's order. *See Maggio v. Zeitz,* 333 U.S. 56, 76, 68 S.Ct. 401, 411, 92 L.Ed. 476 (1948). In the usual labor dispute

the ability of unions and their officers to comply is not an issue. However, in the context of the facts of this case, we think the propriety of imposing fines depends upon whether the government produced clear and convincing proof that the defendants knew they had the power to comply with the court's order. If they reasonably thought that all of the union members, including the individual defendants, were effectively fired before the time the fine commenced under the court's order, noon on August 7, 1981, the fine would not be justified.[1] After careful review of the record we are not satisfied with the sufficiency of the proof, and hence we vacate the fines imposed.

As noted, the President made a general announcement carried by all news media that those controllers who did not report for work by 9:00 a.m. M.D.T. on August 5 "have forfeited their jobs and will be terminated." The clarification received on August 5 by the Salt Lake City Air Route Control Center was not unambiguous; it referred to the first shift after 9:00 a.m. to which employees were directed or scheduled to report. That GENOT communication to the supervisory personnel at the Salt Lake center contained the following instructions:

"1. Controllers who are scheduled to be working on August 5 at 11:00 a.m. EDT and who are not present by that time. Begin issuing letters of proposed removal at 11 a.m. EDT on August 5.

"2. Controllers who are not scheduled to be at work on August 5 until after 11:00 a.m. EDT on that date. On August 5 do not issue proposed removal letters until after the time the employees were scheduled to report for work and have failed to do so. For example, if any employee is scheduled to report for work at 4 p.m. EDT on August 5, wait until 4 p.m. EDT, only after the individual has failed to report for his/her 4 p.m. shift on August 5 should a proposed removal letter be issued.

---

1. The air traffic controllers, who are government civil service employees, do not have rights of reemployment like those given to other strikers. *See* section 2(3) of the National Labor Relations Act, 29 U.S.C. § 152(3).

"3. Controllers whose regular day off is Wednesday, August 5, and who were not previously directed to report for work on that day. Do not issue proposed removal letters on August 5, wait until the first day and time the individuals are scheduled to report to work before issuing any proposal. For example if an employee is on his regular day off on August 5, but is scheduled to return to work on Thursday, August 6 at 4· p.m. EDT wait until 4 p.m. EDT on August 6. Only after the individual has failed to report at 4 p.m. on August 6 should a proposed removal be issued."

R. I, 226. The communication gives a sample letter of removal to be issued to those who are terminated, which provides:

"SPECIFICATION. Beginning first at the (time) shift on (date) you failed to report for your scheduled tour of duty. On (date) you were sent a (telegram/Mailgram) that an illegal strike was in progress and that you must return to duty for your regularly scheduled shift. You failed to return to duty and instead remained absent without authorization."

R. I, 227. There is no evidence in the record that the content of the GENOT was communicated to the union or to the striking employees. The letters of termination issued to both individual defendants referred not to their failure to show up at their first postdeadline shift, but to their August 3 shift:

"SPECIFICATION. Beginning your first shift at 8 a.m., on August 3, 1981, you failed to report for your scheduled tour of duty. On August 3, 1981, you were sent a telegram (WU # 111) that an illegal strike was in progress and that you must return to duty for your regularly scheduled shift. You failed to return to duty and instead remained absent without authorization."

R. I, 149 (letter to Douglas I. Ramsay); see R. I, 221 (letter to Stephen W. Helton).

Salt Lake Facilities Chief O'Neill, when interviewed about noon on August 7 for a television news story broadcast that evening at 6:00 p.m., engaged in the following exchange:

"*TV 5 Question:* Those men who were scheduled to work either Tuesday, Wednesday or Thursday [August 4, 5, and 6], who did not show up, you won't let them walk back through the front gate and sit down at a radar screen and start controlling planes?

*Answer:* No sir, not immediately. There'll have to, have to be a case reviewed first."

R. I, 229. *See also* R. III, 85; R. IV, 46–47.

Counsel for defendants, at the trial court hearing on August 5, demonstrated a misunderstanding of the President's extension of the deadline, declaring that he thought the workers had to report by 2:00 p.m. on August 5, "the next regular shift." R. III, 9, 216, 220. O'Neill's testimony can be construed as indicating he had the same understanding. R. III, 82–85.

Thus, the most publicized statement about the strike was by the President of the United States, stating that all controllers who did not return to work by 9:00 a.m. (11:00 E.D.T.) on August 5, 1981 would be terminated. In addition, the Secretary of Transportation unequivocally stated on August 5 that the strike was over. While the government asserts that the clarification of the President's deadline should have cleared up any confusion, the only evidence in the record concerning the publication of the clarification is that the statement quoted above was made by O'Neill on August 7 on the 6:00 p.m. news.

Other courts that have considered the issue have also been concerned about confusion on the part of controllers as to when they were terminated and thus unable to return to work. The court in *United States v. Professional Air Traffic Controllers Organization, Inc.,* 524 F.Supp. 160 (D.D.C.1981), vacated the imposition of fines.

"In view of the multiplicity of the statements issuing from government officials and the contradictions and ambiguities that they involved, it would have

been impossible for any defendant to know with the requisite definiteness whether a strike or a government refusal to permit air controllers to work was in progress after the three shifts had reported subsequent to 11:00 a.m. on August 5."

*Id.* at 164 n. 6. There was no direct testimony that the defendants knew of the clarification of the deadline. In addition, the chief of the Salt Lake facility admitted that the statements made could reasonably have been interpreted by the controllers to mean that they were foreclosed from returning to work after the deadline. R. IV, 47. Based on all the evidence, we find no error in the court's finding that the defendants deliberately disobeyed its order through August 5, 1981. The trial court did not, however, concentrate on the power of the union leadership to lead its members back to work after the noon August 7 time its fines were to begin.[2] In that respect it erred. Since we believe the record would not support a finding that the defendants reasonably believed they could lead any of their members back to work on August 7 or later, we do not remand this case for reconsideration by the trial court. We vacate the fines that have been imposed.

IT IS SO ORDERED.

---

**2.** Neither in the court's judgment, R. I, 230–31, nor in its comments at the August 21 and 28 hearings, are there findings concerning whether the defendants reasonably believed they represented anyone who was still an employee entitled to return to work. Rather, the court seemed exclusively concerned with obedience to its orders.

"[T]he most direct and significant factor in the entire transaction, so far as the Court's order is concerned, is they were given a— they had a confrontation, they had a specific order of the Court. The Court's order is to be obeyed. They are not relieved from the order of the Court unless they get relief from it. And the Court intends that the order be enforced."

R. V, 18. *See also* R. IV, 57.