972 F.2d 1204
 James P. O'CONNOR, Plaintiff-Appellant,
v.
MIDWEST PIPE FABRICATIONS, INC.,
Defendant-Counterclaimant-Third-Party Plaintiff-Appellee,
v.
Elizabeth L. O'CONNOR, Third-Party Defendant-Appellant,
and
Pipex, Inc., Third-Party Defendant.
 No. 89-3131.
 United States Court of Appeals,
Tenth Circuit.
 Aug. 18, 1992.
 
 Larry L. Simms of Gibson, Dunn & Crutcher, Washington, D.C. (Alicia J. Bentley, Russell G. Petti, Los Angeles, Cal., and Robert W. Planchard, Denver, Colo., with him on the brief), for plaintiff-appellant.
 Thomas H. Dahlk of Lieben, Dahlk, Whitted, Houghton & Jahn, Omaha, Neb., for appellee.
 Before McKAY, Chief Judge, HOLLOWAY and McWILLIAMS, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 In this diversity action, Elizabeth and James O'Connor appeal an order of the United States District Court, District of Kansas, finding them in contempt of that court's earlier order to provide an accounting of their assets and liabilities in aid of execution. Because we hold that the district court did not err in finding that the O'Connors did not provide an adequate accounting as required under state law, we affirm the finding of contempt. We vacate the court's imposition of a monetary sanction, however, for further clarification or modification in light of the principles discussed below.
 
 
 2
 * Elizabeth O'Connor is the president and sole stockholder of Pipex, Inc., a company that sells pipes, valves and water and waste-water treatment equipment. Her husband, James O'Connor, works as a salesman for Pipex. He also sells such equipment on commission for others.
 
 
 3
 Sometime in 1985, Mr. O'Connor filed a breach of contract lawsuit against appellee Midwest Pipe Fabricators, Inc. ("Midwest"), alleging that Midwest had failed to pay him certain commissions. Midwest counterclaimed against Mr. O'Connor and filed a third-party complaint against Mrs. O'Connor and Pipex, asserting fraud and other state law claims, as well as a claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-1965 (RICO). In February 1988, following a jury trial, the district court entered a judgment in favor of Midwest on its claims against the O'Connors and Pipex for approximately $1.1 million. That judgment has not been appealed and is not now before us.
 
 
 4
 After attempts to collect on the judgment failed, Midwest filed a motion in aid of execution asking the district court to direct that approximately $42,000 in promissory notes should remain as assets of the corporation until the status of these corporate loans could be finally determined. These notes were given by Maura O'Connor (the O'Connors' daughter) to Pipex in exchange for loans Pipex made to her. The court granted the motion, and further ordered that the O'Connors "provide an accounting to the court ... of all monies allegedly loaned" to their daughter. II R.Doc. 485 at 3. The O'Connors responded by tendering a letter from Pipex' accountant indicating that Pipex had made cash disbursement loans to Maura O'Connor which Pipex' accountant later discharged by offsetting them as "Director's Fees" paid to Maura.
 
 
 5
 In reply, Midwest filed a "Motion for Mandatory and Prohibitory Injunctive Relief," contesting the accounting and asserting that the O'Connors were trying to hide their assets. The motion was referred to a magistrate. Midwest argued to the magistrate that approximately $350,000 in after-tax profits, directors fees and salaries had been transferred from Pipex to the O'Connors during the pendency of the lawsuit, but that they now claimed they had no money available to satisfy the judgment. The O'Connors did not refute Midwest's claim that they received the alleged transfers. Accordingly, the magistrate recommended that the O'Connors "should be ordered to account for the current status of the $350,000" pursuant to K.S.A. 60-2419, the Kansas statute governing proceedings in aid of execution. II R.Doc. 497 at 5-6. The magistrate further found that "such a hearing would also be useful in order to discover if the O'Connors remain in control of the $350,000 or of property purchased with these funds. The O'Connors may or may not be able to produce the money or property." Id. at 6. The magistrate also recommended that the O'Connors be ordered "to account for all cash accounts opened anywhere since June, 1986 and all assets purchased anywhere during the pendency of this litigation." Id. at 7.
 
 
 6
 The magistrate also found that the O'Connors had failed to comply with the district court's June 7, 1988 order by not providing contemporaneous documentation in support of the O'Connor's claim that Pipex actually paid director's fees to their daughter. Id. at 10. Accordingly, the magistrate recommended that the court issue an order to show cause why the O'Connors and Pipex should not be held in contempt for their failure to completely comply with the court's order. The magistrate suggested that the promissory notes should remain as corporate assets. Id.
 
 
 7
 On August 19, 1988, the district court adopted the magistrate's Report and Recommendation. Specifically, the court ordered an accounting of (1) the $350,000 transferred from Pipex; (2) any cash accounts opened by the O'Connors since June 1986; and (3) all assets purchased by them during the pendency of the litigation. The O'Connors were ordered to "appear before this court for a hearing in aid of execution pursuant to K.S.A. 60-2419[,]" II R.Doc. 498 at 2, and to "show cause why they should not be held in contempt" for failing to comply with the June 7, 1988 order. Id. at 3.
 
 
 8
 On September 16, 1988, the district court conducted a hearing in aid of execution. The O'Connors both testified concerning their assets and submitted documents. Mr. O'Connor acknowledged that during the litigation he and his wife owned $200,000 in certificates of deposit ("CDs") at two Kansas banks. He asserted, however, that these CDs had since been used to pay off loans the O'Connors owed to these same banks, with any remainder going into Pipex' bank account. X R. at 46-47. He further stated that Pipex had sold the company's Mercedes Benz to pay legal fees. He testified that their Kansas home had no equity value because they had refinanced it for over $100,000 in 1986, using the proceeds for home improvement.[1] Id. at 48-51.
 
 
 9
 Moreover, Mr. O'Connor testified that an Olathe apartment complex which the O'Connors held in partnership with others had since gone into foreclosure after the O'Connors stopped making mortgage payments. Id. at 47-48. Mr. O'Connor acknowledged that he and his wife had received $295,650 in salaries and directors fees from Pipex during the litigation. He also stated that his daughter was paid director's fees by Pipex because his daughter "gave my wife tremendous support in Pipex ... after our personal assets and Pipex's assets were attached, until the motion of attachment was quashed[.] ... She was emotionally upset and she relied very heavily on our daughter for support to get her through this particular time." Id. at 30.
 
 
 10
 Mrs. O'Connor then testified, tendering a handwritten spreadsheet along with accompanying documentation purporting to show that the O'Connors had incurred expenses totalling $342,076 during the litigation. Id. at 54 & Ex. 1. Of this money, she stated that they spent $29,494 in home improvements over the course of the litigation, and another $78,000 to improve the Olathe apartment complex. Id. at 68. She also stated that Pipex had loaned her daughter $42,000 in exchange for the promissory notes, but as president of Pipex, she instructed the accountant to offset these notes by paying her daughter "directors fees" in 1987 and 1988. In response, Midwest submitted a memorandum with supporting attachments to the court. See II R. (Supp.) Doc. 514.
 
 
 11
 On December 12, 1988, the district court held the O'Connors in contempt "for failure to account for all cash and assets at the hearing in aid of execution as ordered by this court in its August 19, 1988 Memorandum and Order." II R. Doc. 518 at 3. The court found that:
 
 
 12
 the O'Connors have not adequately satisfied ... the court that they have accounted for all assets available to them to satisfy the judgment. Most notably, they have failed to account for $352,000 which they took out of Pipex, Inc. during the pendency of this lawsuit[.] ... Their attempt to trace this money has not been entirely frank and complete; in attempting to account for the expenditure of this money, they fail to acknowledge that a large portion of those expenditures were paid by other sources. Further, the court rejects the O'Connors' contention that discharged loans to their daughter, Maura, were in payment of director's fees. The evidence on September 16th failed to show that the O'Connors' daughter performed any director's duties.
 
 
 13
 Id. at 2.
 
 
 14
 The court stated that the O'Connors could purge themselves of this contempt by "payment into the court of the $350,000" and "by producing for execution all non-exempt assets" and further "producing documentary evidence ... of the transfer or other disposition ... of all other assets allegedly transferred" during the litigation. Id. at 3. The court added, however, that it would review whether the $200,000 CDs were used to pay off loans after the O'Connors paid $150,000 into the court. Id. The court further ruled that the O'Connors' attempt to discharge the promissory notes was "void" and that the notes remained assets of Pipex. Id. at 2.
 
 
 15
 On December 27, 1988, the O'Connors requested an extension of time pursuant to local rule in which to file a motion for reconsideration. The court granted the extension and on January 5, 1989, the O'Connors moved for reconsideration. In a Memorandum and Order dated May 9, 1989, the court denied reconsideration. Elaborating on its earlier ruling, the court stated that "[t]he evidence at the hearing ... showed that [the O'Connors] had received approximately ... [$600,000] in cash during the relevant years of 1985 through 1987." II R. Doc. 542 at 4. Although the O'Connors had alleged personal expenditures of $342,076, the court reiterated that the evidence showed that "a large portion of these expenditures were paid by other sources." Id. As examples, the court noted that the O'Connors (1) listed over $29,000 as home improvement expenses which were actually paid by refinancing their home, and (2) listed $62,000 in expenses for rental property improvements which were actually paid by refinancing the apartments for approximately $340,000. Id. at 4-5.
 
 
 16
 The court found that Midwest "made a prima facie showing ... that the O'Connors had not complied with the court's orders. The burden was thus shifted to the O'Connors to show that they had a present inability to comply[.]" Id. The court rejected the O'Connors' claim that they never had the $350,000 as untimely, and unsupported by the record in any event. Id. at 3, 5. The court found there was "clear and convincing evidence of the O'Connors' failure to comply with the Court's Order of August 19, 1988, and there was not a good faith effort on their part to comply" at the September hearing. Id. at 6. The court said that it sought "to compel the O'Connors to make complete and truthful statements regarding their assets available to satisfy the judgment." Id. The court also said it was unpersuaded by "[r]epeated attempts to characterize Maura's emotional support of her mother as directors' duties[.]" Id. at 7. Accordingly, in the May 9, 1989 order the court ruled that its December 12, 1988, order would stand and the O'Connors were ordered to pay $150,000 into the court within 30 days or face further penalties. Id. at 6. The O'Connors filed a notice of appeal on May 19, 1989.[2]
 
 II
 A. Midwest's Motion to Dismiss
 
 17
 In this court, appellee Midwest moves to dismiss the O'Connors' appeal, alleging that both the December 12, 1988 and May 9, 1989 orders are nonfinal. Midwest also argues that even if the December order is final, the motion for reconsideration was untimely because the district court cannot extend the ten-day time limit in which to move to alter or amend a judgment. See Fed.R.Civ.P. 6(b) & 59(e). Thus, Midwest insists that the motion did not toll the time to file this appeal. Because of the circumstances we treat below, we reject these challenges to our jurisdiction.
 
 
 18
 On the question of finality, we are mindful of the general rule that "a finding of civil contempt is not reviewable on interlocutory appeal." Combs v. Ryan's Coal Co., 785 F.2d 970, 976 (11th Cir.), cert. denied sub nom, Simmons v. Combs, 479 U.S. 853, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986). Despite this rule, however, in the postjudgment stage of a case, "[o]nce the finding of contempt has been made and a sanction imposed, the order has acquired all the 'elements of operativeness and consequence necessary to be possessed by any judicial order to enable it to have the status of a final decision' " under 28 U.S.C. § 1291 (1976). Shuffler v. Heritage Bank, 720 F.2d 1141, 1145 (9th Cir.1983) (quoting SEC v. Naftalin, 460 F.2d 471, 475 (8th Cir.1972)). In light of these principles, we hold that the May 9, 1989 order, directing that the O'Connors pay $150,000 into court within thirty days and further comply with the December 12, 1988 order, is appealable. The order for the $150,000 payment was unconditional and could not be avoided by some other form of compliance. Combs v. Ryan's Coal Co., 785 F.2d at 976. The appeal from that order further calls into question all the rulings which produced the order. Herron v. Rozelle, 480 F.2d 282, 285 (10th Cir.1983).
 
 
 19
 The O'Connors argue that the earlier December 12, 1988 order "was probably not a final and appealable order." Brief of Appellants 35. In that order, the district court held that the O'Connors could purge themselves of contempt by "payment into the court of the $350,000" and "by producing for execution all non-exempt assets" and further "producing documentary evidence ... of the transfer or other disposition ... of all other assets allegedly transferred" during the litigation. II R. Doc. 518 at 3. The court stated that the O'Connors "must purge themselves of this court's contempt within 45 days ... or face further penalties." Id. However, the court then modified its decision that the O'Connors must pay $350,000 by stating: "The court will review the situation at such time as [the O'Connors] pay $150,000 into the court, to determine whether $200,000 in certificates of deposit in fact went to pay off loans." Id.
 
 
 20
 The provisions of this December 12 order are not as clear for appealability purposes as the May 9, 1989 order and we hold that it did not put the O'Connors on notice of the need to appeal then. The district court's order was ambiguous as to the time limit on when the $350,000 must be paid in full. The court clearly hinged further inquiry into the status of the $200,000 CDs upon payment of the $150,000, doing so after purporting to set a sanction and time limit to comply. Moreover, we believe it is possible to read the district court's statement that it would review "the situation" to refer to the finding of contempt itself. Read in this manner, the O'Connors reasonably could have believed that the court's adjudication of contempt remained tentative on December 12. As such, we do not deem the December 12 order to be final for purposes of appeal because further proceedings on the merits of the contempt determination were plainly contemplated and the O'Connors were not clearly informed that the litigation on their contempt had ended with nothing else remaining for court action. See, e.g., Coopers & Lybrand v. Livesay, 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978).
 
 
 21
 Accordingly, the O'Connors' notice of appeal filed on May 19, 1990--ten days after the final judgment on May 9, 1989--was timely under Fed.R.App.P. 4(a)(1). Midwest's motion to dismiss this appeal is denied.
 
 B.
 
 22
 On the merits of their appeal, the O'Connors essentially raise two claims of error: (1) that the district court improperly exercised its contempt power to enforce a money judgment; and (2) that the court improperly imposed a monetary sanction after they established their inability to pay at the hearing.
 
 1. Standard of Review
 
 23
 When reviewing a district court's finding of civil contempt, we have said that our review is limited to whether the court "abused its discretion." United States v. Riewe, 676 F.2d 418, 420 (10th Cir.1982). "A district court has broad discretion in using its contempt power to require adherence to court orders." Id. at 421. In determining whether the court committed legal error by violating limits on such power, our review is de novo. See Combs v. Ryan's Coal Co., 785 F.2d at 979-80.
 
 2. Use of Contempt to Enforce Payment
 
 24
 The O'Connors first attack the district court's contempt order by arguing that it is improper for a court to use the contempt power to enforce a money judgment. The O'Connors rely, inter alia, on the Eleventh Circuit's Ryan's Coal Co. case where the court stated that "when a party fails to satisfy a court-imposed money judgment the appropriate remedy is a writ of execution, not a finding of contempt." Id., 785 F.2d at 980 (citing Shuffler, 720 F.2d at 1147-48).
 
 
 25
 Arguably there may be support for such an exercise of contempt power for the enforcement of a money judgment. Cf. Freeman v. Heiman, 426 F.2d 1050, 1052 (10th Cir.1970) (not improper to order installment payments under state statute where judgment debtor found to have assets sufficient to pay judgment, despite the "possibility of punishment for contempt"); see also Atlas Corp. v. DeVilliers, 447 F.2d 799, 803 (10th Cir.1971); Laborers' Pension Fund v. Dirty Work Unlimited, Inc., 919 F.2d 491, 494 (7th Cir.1990). On the other hand, we also note that the Kansas Bill of Rights provides: "No person shall be imprisoned for debt, except in cases of fraud." Kan.Const. § 16. Here, however, decision of this troublesome question is not necessary at this juncture because we are persuaded that we must remand for further proceedings and clarification of the order appealed, as explained below. The decision of this question should be made thereafter, if necessary.
 
 3. Ability to Comply
 
 26
 We note that the O'Connors have clearly misconstrued the substance of the district court's order. They have not been found in contempt for failing to pay a monetary judgment. Thus, their argument that they are unable to comply because they do not have the wherewithal is misdirected. Rather, as the district court's orders show, the O'Connors were held in contempt for failing to fully account for the property which they might have available to satisfy that judgment. See II R. Doc. 518 at 3; II R. Doc. 542 at 5-6. Thus, the only "ability to comply" of relevance here is their ability to provide information about assets they acquired during the litigation--information peculiarly within the O'Connors' own knowledge. Cf. Donovan v. Burgett Greenhouses, Inc., 759 F.2d 1483, 1486 (10th Cir.1985).
 
 
 27
 Once Midwest experienced difficulty in locating assets belonging to the O'Connors to satisfy its judgment, the district court properly invoked K.S.A. 60-2419, "the practice and procedure" used in Kansas. See Fed.R.Civ.P. 69(a). The Kansas statute specifically provides that "[a]n order for a hearing in aid of execution shall require the judgment debtor to appear and answer concerning the debtor's property and income, before the judge." K.S.A. 60-2419 (Supp.1991). The statute further provides that "[i]f any person ... refuses to appear and answer concerning the person's property and income at the time and place specified in an order for a hearing in aid of execution ..., the person shall be guilty of contempt of court[.]" Id. Finally, the statute states that such persons "shall be punished as the court directs." Id. Thus, pursuant to this statute, the court correctly ordered the O'Connors to provide an accounting and was empowered to find them in contempt if they failed to comply. Laborers' Pension Fund, 919 F.2d at 494 (state practice and procedure empowered federal court to issue turnover order and resulting contempt order).
 
 
 28
 As we have noted before, "[i]n civil contempt cases, the proof of contempt must be clear and convincing." United States v. Professional Air Traffic Controllers Org., 703 F.2d 443, 445 (10th Cir.1983). The instant record contains clear and convincing evidence which supports the district court's ruling that the O'Connors failed to account for their assets at the September 1988 hearing. In its August 19, 1988, order, the district court instructed the O'Connors to account for $350,000 that they removed from Pipex during the litigation and to explain why their daughter's loans were written off by the company.[3] Instead, they presented to the court an itemized list of "expenses," totalling $342,076, which cross examination showed to contain expenses paid with funds from other sources. The evidence shows that during the litigation the O'Connors received or held $295,650 in salaries, $60,000 from refinancing their home, $200,000 in CDs, and $342,400 from financing four units of their apartment complex. See X R. at 46, 52; II R. (Supp.) Doc. 514 at 5, 6 n. 3 & attached Appendix. Thus, they not only did not account for the full $350,000 when they presented a list of expenses totalling $342,076, but in fact, they presented evidence which indicates they acquired $898,050 during the litigation--far more than their expenses.
 
 
 29
 The Supreme Court of Kansas has described the scope of a 60-2419 proceeding as "very broad" and has stated that "the Kansas law on proceedings in Aid of Execution require [sic] a judgment debtor to respond and in good faith make disclosure to [the] judgment creditor as required." Fleming v. Etherington, 227 Kan. 795, 610 P.2d 592, 595, 597 (1980) (quoting trial court). Moreover, the Kansas Court has affirmed a trial court's use of the contempt power when a litigant has failed to provide a full accounting. See id.; see also Threadgill v. Beard, 225 Kan. 296, 590 P.2d 1021, 1026 (1979) (parallel statute for small claims court judgments providing penalties of contempt can be invoked to secure compliance with order to appear and make disclosure). In light of the evidence presented at the September 1988 hearing, we conclude that the district court did not abuse its discretion by using the contempt power granted by K.S.A. 60-2419 against the O'Connors upon their failure to provide a full and complete accounting of their assets. Accordingly, we affirm the court's finding of contempt.
 
 
 30
 Despite this conclusion, however, we believe the district court imposed contempt sanctions on the O'Connors which are inconsistent with the principles governing civil contempt. Although the court could properly infer from the evidence at the hearing that the O'Connors had a present ability to pay the judgment, thereby shifting the burden on to the O'Connors to show an inability to comply, see Donovan, 59 F.2d at 1486 (10th Cir.1985); Heinold Hog Market, Inc. v. McCoy, 700 F.2d 611, 615 (10th Cir.1983), neither the record nor the district court's findings adequately demonstrate the basis and purpose of the $150,000 sanction imposed in the May 9, 1989 order appealed from.
 
 
 31
 Sanctions for civil contempt may only be employed for either or both of two distinct remedial purposes: "(1) to compel or coerce obedience to a court order ...; and (2) to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance[.]" Shuffler, 720 F.2d at 1147 (citing Shillitani v. United States, 384 U.S. 364, 370-71, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966) and Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911)); see United States v. United Mine Workers, 330 U.S. 258, 303-04, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); Ager v. Jane C. Stormont Hosp., 622 F.2d 496, 500 (10th Cir.1980). Where the purpose of the sanction is "coercive," the court must consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." United Mine Workers, 330 U.S. at 304, 67 S.Ct. at 701. The Supreme Court has also recently cautioned that a court must exercise "the least possible power adequate to the end proposed." Spallone v. United States, 493 U.S. 265, 280, 110 S.Ct. 625, 635, 107 L.Ed.2d 644 (1990) (quotation omitted). To be consistent with these principles, coercive civil sanctions may only continue "until terminated by compliance." Professional Air Traffic Controllers, 703 F.2d at 445.
 
 
 32
 On the other hand, "[i]f a fine is imposed for compensatory purposes, the amount of the fine must be based upon the complainant's actual losses sustained as a result of the contumacy." Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc., 646 F.2d 800, 810 (2d Cir.1981); see United Mine Workers, 330 U.S. at 304, 67 S.Ct. at 701; Allied Materials Corp., 620 F.2d 224, 227 (10th Cir.1980). Moreover, "[i]n the absence of evidence showing the amount of the loss, any sum awarded by the court is speculative and therefore arbitrary." Allied Materials Corp., 620 F.2d at 227.
 
 
 33
 As indicated, the O'Connors' contumacious conduct consists of their failure to provide a complete accounting of their assets at the September 1988 hearing. Because this is a civil contempt proceeding, the district court must fashion sanctions intended to coerce the O'Connors into providing a complete accounting or to compensate Midwest for costs it has incurred as a direct result of their failure to provide this information, or both. Instead, in initially imposing the monetary sanction here the district court simply ordered that the O'Connors "pay $150,000 into the court[.]" II R. Doc. 518 at 3.
 
 
 34
 On review of the district court's orders, we are unable to determine clearly the justifying basis and purpose of this $150,000 monetary sanction.[4] We cannot, on this record, conclude that the amount assessed was a compensatory fine payable to Midwest because there is an absence of any evidence showing the amount of Midwest's loss, cf. Allied Materials Corp., 620 F.2d at 226-27 (testimony regarding attorney's fees), and the court did not direct that the money would go to Midwest. Nor can we determine that the sanction imposed is a coercive fine--to force the O'Connors to provide a complete accounting--because such a fine was not accompanied by an opportunity for the O'Connors to purge themselves by providing that accounting within a reasonable time.[5] See, e.g., United Mine Workers, 330 U.S. at 304-05, 67 S.Ct. at 702 (conditioning $2.8 million coercive fine on defendant's failure to purge within a reasonable time).
 
 
 35
 Thus, because the district court's orders neither explained the purpose and factual basis of what might have been a compensatory sanction, nor provided the O'Connors with an opportunity to purge themselves in conjunction with what might have been a coercive fine, we must vacate the monetary sanction imposed by the court's orders of December 12, 1988 and May 9, 1989 and remand. The order of January 3, 1990 issuing bench warrants is vacated because it is based on the earlier monetary sanctions.
 
 III
 
 36
 Accordingly, we DENY appellee Midwest's motion to dismiss this appeal. We AFFIRM the orders of December 12, 1988, May 9, 1989 and January 3, 1990 to the extent that they found the O'Connors in contempt for failing to provide an accounting of their assets available for satisfaction of the judgment as required by K.S.A. 60-2419 and to the extent that they declare the promissory notes to be assets of Pipex. We VACATE those portions of the same orders to the extent they impose sanctions for this contempt by ordering the $150,000 payment to be made within the 30 day period specified and the January 3, 1990 order for the bench warrants, and REMAND for the district court to conduct further proceedings necessary and for the entry of further findings and orders appropriate under the court's civil contempt powers in accord with this opinion.
 
 
 37
 IT IS SO ORDERED.
 
 
 
 [1]
 From our record, it appears that the proceeds for the Mercedes actually went to pay off a loan which the Mercedes had secured. See III R. (Supp.) Doc. 516, Ex. 10 & 11. Additionally, Midwest indicates that the O'Connors actually only received $60,000 from refinancing their home. See Answer Brief of Appellee at 4 n. 1
 
 
 [2]
 During the pendency of this appeal, the district court refused to grant a stay until the O'Connors posted a $100,000 supersedeas bond. The O'Connors did not post the bond. On January 3, 1990, the district court announced its intention to issue bench warrants to arrest the O'Connors unless they purged themselves of the contempt by payment of $150,000 into the court within five business days. On January 10, 1990, this court granted the O'Connors' emergency application for a stay of the district court's January 3rd order
 
 
 [3]
 In this appeal, the O'Connors do not directly challenge the district court's decision to require that the promissory notes remain as assets of Pipex. We do not disturb this ruling because, as the court noted, there was no evidence that Maura performed any director's duties. Rather, she appears to have only provided her mother with emotional support. See X R. at 30. As such, this transfer of assets to avoid the judgment was properly voided. See DeVilliers, 447 F.2d at 805-06 (transfer of assets to children without consideration was fraudulent conveyance)
 
 
 [4]
 It is true that the May 9, 1989 order stated that the court "finds that this civil contempt citation is for the purpose of coercing compliance with this Court's Order of August 19, 1988" (which had directed disclosures). II R. Doc. 542 at 6. Further the May 9 order directed that the O'Connors pay the $150,000 into court within 30 days and to further comply with the December 12, 1988 order. The December 12, 1988, order stated that the O'Connors "may purge themselves of this contempt by" payment into court of $350,000 for which Midwest Pipe contends the O'Connors have not accounted, and by producing for execution all nonexempt assets which the O'Connors control
 Thus the orders do contain some indications of the court's purpose behind the contempt orders at various points. However, as explained in text, the critical May 9, 1989 order which premises this appeal is simply unclear as to the justifying basis and purpose of ordering the $150,000 payment.
 
 
 [5]
 As we understand the record, the O'Connors have presented evidence to explain $342,076 in expenses out of $898,050 apparently held by them at some time during the litigation. Mrs. O'Connor apparently also testified at her deposition that they paid $205,000 for the aforementioned apartment complex. See II R. (Supp.) Doc. 514 at 6 (citing deposition of March 1988). Thus, the O'Connors might be found to purge themselves by providing adequate evidence to explain the disposition of the difference between these figures. Of course, we leave any fact findings to be made on any further accounting to the trial court
 Additionally, should the trial court decide to impose any coercive sanction on remand, such sanction must be accompanied by a new finding of the O'Connors' present ability to comply. Cf. Shillitani v. United States, 384 U.S. at 371, 86 S.Ct. at 1536 (the justification for coercive civil contempt sanction "depends upon the ability of the contemnor to comply"). Because their financial situation may have changed since the entry of the initial contempt finding in the December 12, 1988 order, the O'Connors must be afforded an opportunity to present evidence on this issue. See Maggio v. Zeitz, 333 U.S. 56, 75 & 76, 68 S.Ct. 401, 411, 92 L.Ed. 476 (1948) (contemnor "cannot challenge the previous adjudication of possession, but that does not prevent him from establishing lack of present possession"); see also United States v. Rylander, 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983) (contemnor has the burden of production to show present inability to comply).