Thomas E. **PEREZ, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**PARAGON CONTRACTORS CORPORATION, Brian Jessop, and James Jessop, Defendants.**

**Case No. 2:06–CV–00700–TC**

United States District Court, D. Utah, Central Division.

Filed 12/06/2016

Order Denying Reconsideration Filed 02/01/2017

Amanda A. Berndt, Jeffrey E. Nelson, US Attorney's Office, Salt Lake City, UT, Katherine Vigil, US Department of Labor Office of the Solicitor, Denver, CO, for Plaintiff.

Heath H. Snow, Stephen R. Schwendiman, Bingham Snow & Caldwell LLP, St. George, UT, for Defendant.

## ORDER ON SANCTIONS

TENA CAMPBELL, U.S. District Court Judge

Behind a veil of secrecy in Southern Utah's desert country the Defendants profited from the labor of a religious community's children in violation of the court's previous injunction. Having already found

the Defendants in civil contempt, the court now imposes sanctions.[1]

As a remedy for Defendants' contempt, the court appoints a special master to monitor Defendants' compliance with the court's injunction, and the court orders that Defendants pay money to the Department of Labor to create a fund which will be used to compensate the children for their work.

## BACKGROUND

Brian Jessop owns Paragon Contractors Corporation (Paragon) and his brother, James Jessop, serves as the vice-president. Paragon's usual business is construction.

On November 29, 2007, the Secretary of Labor for the Department of Labor (the Department) filed a lawsuit against Defendants' use of child labor in the construction industry. The parties reached an agreement to settle the lawsuit which resulted in the court issuing a permanent injunction (Injunction) directing that Defendants Paragon, Brian Jessop, and James Jessop stop employing minors under conditions that constitute oppressive child labor as defined by the Fair Labor Standards Act (FLSA).

After the court had issued the Injunction, Paragon and the Southern Utah Pecan Ranch (the Ranch) agreed that Paragon would harvest the Ranch's pecans for a negotiated price.[2] In the years before Paragon and the Ranch reached their agreement, the then-manager of the Ranch allowed members of the Fundamentalist Church of Jesus Christ of Latter Day Saints (FLDS) to gather pecans that had fallen to the ground. At the time, the Ranch allowed the FLDS church to keep 50% of the pecans gathered.

Under the new 2008 agreement, Paragon was in charge of harvesting all the Ranch's pecans. The Ranch would keep 70% of the proceeds from the sale of pecans and give Paragon the rest.

In December 2012, CNN filmed hundreds of children working at the Ranch. When approached by the reporters, the children and the few supervising adults scattered, making it difficult for the reporters to interview them. After watching CCN's footage the Department decided to investigate whether Paragon or the Jessops were somehow involved.

A lengthy investigation pursued, made lengthier by Defendants efforts to hamper discovery—which required the Department to file subpoena-enforcement actions. After gathering evidence, the Department filed an order to show cause why Defendants should not be held in contempt for violating the Injunction by using children to harvest pecans for the Defendants' benefit.[3] The court granted the motion and held an evidentiary hearing.

At the hearing, as well as throughout discovery, it became clear that Paragon and Brian Jessop were not trustworthy and would go to great lengths to deceive the court and the Government. Brian Jessop and Dale Barlow, Paragon's employee in charge of the pecan harvest, were evasive and gave disingenuous testimony. In fact, two other judges in related cases determined that Brian Jessop was "disingenuous" and "lacked believability." Harris v. Paragon Contractors Corp., No. 2:13–

---

1. In finding Defendants in civil contempt, the court issued lengthy Findings of Fact and Conclusions of Law. (Findings of Fact and Conclusions of Law, ECF No. 99.)

2. The Ranch yielded over 150,000 pecans in a good year.

3. Defendants Paragon and Brian Jessop were named in the Department's motion. James Jessop was not. Accordingly, though this Order refers to "Defendants," it pertains only to Paragon and Brian Jessop, not James Jessop.

cv–00281, slip op. at 2 (D. Utah June 20, 2013) (decision and recommendation to enforce subpoenas); Harris v. Paragon Contractors Corp., No. 2:13–cv–00281, slip op. at 3 (D. Utah Aug. 21, 2013) (order adopting Judge Furse's decision and recommendation to enforce subpoenas).

Both at the Ranch and in the construction industry, Defendants sought to conceal their violation of the Injunction. A child who worked for Paragon at the Ranch stated that she was instructed by Brian and James Jessop "that if anyone ever asked [her] if Paragon is associated with the nut harvest to say no and pretend [she] didn't know anything." (Decl. of Alyssa Bistline ¶ 31, ECF No. 62.) She also testified that after the court enjoined Paragon from using child labor, she overheard her stepfather, James Jessop, state that "he had to outright lie" to the Department of Labor and that "there was no way that they could stop using the under-aged boys in their crews, but would have to be more discreet." (Id. ¶ 33.) She explained that Paragon "created a signal for when the children needed to hide on job sites" and that her brother had "hidden for hours in a shed before the coast became clear." (Id.)

In spite of their attempts to deceive the court and the Government, the court learned at the evidentiary hearing that Paragon and Brian Jessop worked in concert with the FLDS church to make children gather pecans. The children, when asked if they participated voluntarily, testified that they "really didn't have a choice," and that if they did not participate they would be "in big trouble." (See e.g. Contempt Hr'g Tr. 277, Jan. 26, 2016, ECF No. 95; Contempt Hr'g Tr. 50, Jan. 25, 2016, ECF No. 89.) One child stated that if she did not participate in the pecan harvest she would risk "losing [her] family," and "getting kicked out of the community." (Contempt Hr'g Tr. 50, ECF No. 89.) She testified that she was told, "[I]f you rebel or disobey, you will lose your family and you will be removed." (Id.) One parent who sent his children to the pecan harvest described the pressure he felt from the FLDS church, explaining that if he did not obey the directives to send his children to the pecan harvest, "they could remove me from—or remove my family from me. So yes, I would send my children." (Id. at 102.)

The FLDS church closed its non-public schools during the pecan harvest. In contrast, the public schools in the area were not closed. Instead of going to school for their education, the children congregated at the schools, loaded into vans, and were sent to the Ranch, in good weather and bad.

The children's working conditions were often harsh. The children did not have an opportunity to rest if they wanted and often were not given any lunch. Many children testified that they were forced to work in cold weather. One child affirmed, "[I]t got really cold while we were working and we were not allowed to sit in the vans and there would be crowds around the port-a-potties because people were warming up there." (Winnie Barlow Aff. ¶ 13, ECF No. 74.) Children tried to spend time in the port-a-potties to warm up, or in the vans, but were forced to return to the harvest. Additionally, because there were not enough port-a-potties for all the children, they occasionally resorted to soiling their pants.

After learning this information, the court found Paragon and Brian Jessop in contempt of the Injunction. The court however, did not impose sanctions at that time. Rather, the court asked the parties to provide briefing on what the appropriate sanction should be. The court received the briefing and held a hearing.

## DISCUSSION

To remedy the Defendants' contempt, the Department asks the court to (1) appoint a special master to monitor Defendants' compliance with the FLSA and related regulations, (2) require Defendants to compensate the children for their unpaid labor, and (3) enter "an amended permanent injunction to coerce Defendants into compliance and to compensate the children who were not paid for their labor." (Pl.'s Proposed Contempt Sanctions 2, ECF No. 101.) Defendants respond that these proposed sanctions are "onerous" and "bear no relation to the [Injunction's] child labor prohibitions or to the need to coerce compliance." (Defs.' Resp. to Pl.'s Proposed Sanctions Order 1, ECF 103.)

■ District courts have "inherent power to enforce compliance with their lawful orders through civil contempt." Shillitani v. United States, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). When faced with fashioning sanctions for a party's civil contempt, a "district court may exercise broad discretion in using its contempt power to assure compliance with its order." Rodriguez v. IBP, Inc., 243 F.3d 1221, 1231 (10th Cir. 2001). And "the measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief." McComb v. Jacksonville Paper Co., 336 U.S. 187, 194, 69 S.Ct. 497, 93 L.Ed. 599 (1949). But civil-contempt sanctions may be used only for "two distinct remedial purposes: (1) to compel or coerce obedience to a court order ...; and (2) to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance." O'Connor v. Midwest Pipe Fabrications, Inc., 972 F.2d 1204, 1211 (10th Cir. 1992) (citation and internal citation marks omitted) (ellipsis in original).

■ Where the purpose of the sanction is "coercive," the court must consider "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." Id. (citation and internal quotation marks omitted). To be consistent with these principles, coercive sanctions may continue only "until terminated by compliance." Id. (citation and internal quotation marks omitted)

■ Where the sanction is compensatory in nature, the amount of the fine must be based on "actual losses sustained as a result of the contumacy." Id. (citation and internal quotation marks omitted). The court must have "some basis" for determining the amount of a compensatory sanction. Allied Materials Corp. v. Superior Prod. Co., 620 F.2d 224, 227 (10th Cir. 1980).

## I. The Court Appoints a Special Master.

■ The Department asks the court to appoint a special master at Defendants' expense for a five-year period to conduct unannounced worksite inspections and "ensure that the Court's orders are being implemented properly and complied with over time." (Pl.'s Proposed Contempt Sanctions 4.) Defendants respond that the appointment of a special master "is wholly unnecessary." (Defs.' Resp. 4.) They claim that the Department failed to present "any evidence at the evidentiary hearing of ongoing child labor violations" and, accordingly, "there is no justifiable reason to order Defendants to be subjected to oppressive conditions." (Id.) Further, Defendants reason that the appointment of a special master is an unwarranted burden as it would cost them time and money. According to Defendants, "if the Department of Labor wants to determine whether Defendants are in compliance with the

child labor provisions of the FLSA, it is free to conduct audits and inspections and to evaluate payroll and other records." (Id. at 5.)

Here, shortly after being caught using child labor in the construction industry and agreeing to the entry of the Injunction, Defendants secretly began profiting from child labor once again. Defendants sought to conceal their knowing and willful violation of the Injunction. They told employees to lie about the child labor and even developed signals and strategies for hiding child workers during inspections. They failed to maintain records of work performed on the Ranch, denied the Department access to the Ranch, refused to provide names of employees who worked at the Ranch, refused to respond to subpoenas, and made incredible denials of their involvement with the work at the Ranch. Additionally, the court found Defendants "not credible," and their testimony "evasive and often ... contradicted by other witnesses' testimony." (Findings of Fact and Conclusions of Law 6–7, ECF No. 99.)

The court understands that coercive sanctions may continue only until the Defendants comply with the Injunction. O'Connor, 972 F.2d at 1211. But Defendants have left the court with no assurance that they are in compliance with its order or that they will, on their own accord, comply in the future. Defendants' behavior has convinced the court that without sufficient oversight they will continue violating the Injunction and profiting from the labor of children. Further, Defendants' behavior illustrates the necessity of a special master: they have previously resisted inspections by the Department and have failed to keep records. In light of this history, requiring the Department to expend extra resources policing obstreperous defendants is unreasonable.

The court has "broad discretion in using its contempt power to assure compliance with its order." Rodriguez, 243 F.3d at 1231; see also 3 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §´ 2602.1 (3d ed. 2008) (appointment of special master is appropriate "particularly when a party has proved resistant or intransigent"). Accordingly, the appointment of a special master is necessary to assure compliance here. The details of the special master's duties are listed below.

## II. The Court Orders Defendants to Pay $200,000 to Create Fund for Unpaid Wages.

 The Department asks that the court order Defendants to pay $200,000 to the Department so that it can establish a "claims process ... under which individuals who worked for Defendants at [the Ranch] ..., or parents in the case of minor children, may submit claims for payment of back wages based on the number of hours worked, including any overtime." (Pl's Proposed Contempt Sanctions 9.) The Department admits that it is "not able to calculate the amount of back wage liability," (id.) but believes that by setting up a claims process, the employees can make "legitimate claims" and "demonstrate actual losses sustained." (Pl.'s Reply to Defs.' Resp. to Pl.'s Proposed Sanctions Order 4.)

Defendants respond that an order requiring payment into a fund is impermissibly speculative in nature. They argue that the Department has not provided, and does not possess, sufficient evidence to determine who worked and for how long. Further, Defendants contend that the Department's proposed payment scheme subverts the court's "authority by allowing the [Department] to evaluate any claims and to disburse any back wages without any consideration by Defendants." (Defs.' Resp. 6.)

Here, though the FLSA requires it, Defendants claim they did not maintain records regarding who worked on the Ranch and for how long. And Defendants refused to identify children employed at the Ranch, including—incredibly—Brian Jessop's own children. The court will not allow Defendants to benefit from their failure to keep, or produce, labor records for the Ranch. On the other hand, Defendants' failure to maintain records creates a problem: the court is left with insufficient evidence to determine compensatory sanctions. For this reason, requiring Defendants to pay into an interest-bearing account (Fund) on which children can make claims provides an workable solution: it allows individuals to come forward with some evidence regarding whether they worked on the Ranch and for how long. Accordingly, payments from the Fund will be based on "losses sustained as a result of the contumacy." O'Connor, 972 F.2d at 1211 (citation and internal quotation marks omitted).

Though lack of records may hinder the ability to discern "the precise extent of uncompensated work," the solution "is not to penalize the employee by denying him any recovery .... Such a result would place a premium on an employer's failure to keep records in conformity with [the law]." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). Accordingly, the law favors a system in which individuals may make claims on the Fund, carrying their burden of production by establishing that they worked at the Ranch in violation of the Injunction. They may do so by producing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id. Considering the evidence presented by the Department regarding the potential number of children who worked at the Ranch and the hours they worked, $200,000 likely underestimates the amount necessary for a compensatory sanction. But this amount provides an adequate starting point, and Defendants may have to pay more if legitimate claims exceed $200,000, as explained below.

Defendants also argue that this amount is impermissible because the Department "has expressly linked this requested amount to Paragon's failure to pay minimum wages to the minors who were involved with the [Ranch's] nut harvest." (Defs.' Resp. to Pl.'s Suppl. Br. on Pl.'s Proposed Sanctions Order 4, ECF No. 108.) But the court is not ordering Defendants to pay $200,000 into the Fund for violating minimum-wage or overtime requirements. Rather, the court is ordering that Defendants pay because they violated the Injunction. This is a compensatory sanction to reimburse the children who worked at the Ranch. Of course, anytime a person is compensated for labor it begs the question: how much to pay? The court agrees with the Department that, at a minimum, the children's labor should be compensated at a rate equal to minimum wage plus overtime. Of course, because Defendants are in contempt only for violating the Injunction, and not for violating the FLSA generally, only children who can provide some evidence that their employ violated the Injunction will be compensated from the Fund—this excludes persons who have claims only for Paragon's violation of overtime or minimum-wage laws. The details concerning the establishment of the Fund and the form of the claims are set forth below.

### III. The Court Will Not Enter an Amended Permanent Injunction.

The Department requests that the court enter an amended permanent injunction against Defendants, adding provisions designed to enjoin Defendants from violat-

ing the FLSA's minimum-wage, overtime, and record-keeping requirements. Defendants respond that expanding the scope of the Injunction is not an appropriate civil sanction.

Here, the court found Defendants in civil contempt for violating the Injunction. As mentioned before, civil contempt sanctions can be either compensatory or coercive. O'Connor, 972 F.2d at 1211. Expanding the scope of the Injunction would do nothing to compensate the children for their labor. And though expanding the scope of the Injunction could coerce defendants to obey laws not already mentioned in the Injunction, it would do nothing to coerce Defendants to obey the laws explicitly addressed by the Injunction. Coercive sanctions are meant to coerce compliance with an existing injunction, not a new one.

## ORDER

For the reasons discussed above, the court ORDERS as follows:

1. <u>Appointment of a Special Master:</u> The court will appoint a special master in accordance with Rule 53 of the Federal Rules of Civil Procedure. The special master will monitor Defendants' ongoing compliance with the Injunction and will ensure that the court's orders are being implemented properly and complied with over time.

 a. Defendants will bear the costs associated with the special master which will be billed on a quarterly basis.

 b. The parties will attempt to agree on the selection of the special master. If the parties are unable to agree, each party will submit a list of three recommendations with each proposed special master's resume and qualifica-

tions. Using this information, the court will make a final selection.

 c. For a period of five years the special master will be responsible for evaluating Defendants' ongoing compliance with the Injunction. The special master will provide to the Wage Hour Salt Lake City District Office ("Wage Hour") a statement regarding Defendants' compliance or noncompliance with the Injunction on a bi-annual basis from 2017 through 2022 at the following address: 60 E. South Temple Street, Suite 575, Salt Lake City, Utah 84111.

 d. The special master will conduct a minimum of four unannounced inspections of Defendants' work sites each year. The special master will immediately notify Defendants, or any successors in interest, and Wage Hour of any findings of noncompliance.

 e. In the event of a finding of noncompliance by the special master at any point during the monitoring period, Defendants must correct the noncompliant action or contest the special master's finding within four business days. In the event Defendants correct the noncompliant action, they must provide the special master and Wage Hour with proof that appropriate corrective action has been taken. The Department maintains the right to open an investigation regarding any reported noncompliant actions to determine whether it will take further legal action.

 f. Defendants will comply with the following notification requirements for a period of five years:[4]

---

4. For all notification requirements set forth in "section f" above, Defendants are defined as follows:

<u>Paragon</u>: Paragon, any successors in interest, or any entity in which Paragon holds an ownership interest of 5% or more.

i. Paragon and Mr. Jessop will, at least three days before beginning work on any project, and immediately for projects on which they already are working, provide notification via email to the special master and the district director for Wage Hour regarding:

1. The location of every work site where Paragon and Mr. Jessop perform work regardless of whether the work is pursuant to contract or other formal or informal arrangement;

2. The identity and the dates of birth of all of Mr. Jessop's and Paragon's workers on such work sites.

ii. Mr. Jessop will disclose through email to the special master and the district director for Wage Hour the names and addresses of any businesses in which he or Paragon has more than a five percent ownership interest during the five-year reporting period. The Department should provide Wage Hour's email address to Mr. Jessop within seven days from the entry of this order.

iii. Mr. Jessop will disclose through email to the special master and the district director for Wage Hour, at least five days before commencing work, the location of every work site where Mr. Jessop is working in any capacity.

iv. Mr. Jessop will provide to the Special Master and to Wage Hour, within ten days of changing employment (whether he works for a company he owns or not): (i) an affidavit with the name of his new employer (including address and phone number); (ii) a description of his job duties and the name of his supervisor; and (iii) an affidavit from a principal of the employer attesting to Mr. Jessop's percentage of ownership (if any), whether Mr. Jessop supervises any employees and if so their names and ages, and a list of any related entities.

g. Paragon and Mr. Jessop will allow the Department to conduct investigations at any of its job sites and allow entry to its job sites and headquarters immediately upon request without a warrant or any other prerequisite for entry.

2. Payment into a Fund to Compensate Children:

a. Within ten days of the entry of this Order, Defendants will send a cashier's check in the amount of $200,000.00 to the Department of Labor, Office of the Solicitor, 1244 Speer Boulevard, Suite 515, Denver CO 80202, made payable to "USDOL–Wage Hour Division."

b. The Department will put this money in to the Fund, which must be an interest-bearing account, and for a period of one year from the entry of this order, individuals who worked for Defendants at the Ranch between 2008 and 2013, or parents in the case of minor children, will be permitted to submit a claim to the Department for compensatory payments based on the number of hours worked, including any overtime. The Department must take reasonable measures to inform individuals with potential claims

Mr. Jessop: Brian Jessop, any entity for which Jessop acts as an employer pursuant to 29 U.S.C. § 203(d); any entity in which Jessop is a manager, officer, or supervisor; any entity in which Jessop holds an ownership interest of 5% or greater; or any entity for which Jessop acts as an employer, a manager, officer, or supervisor; or any entity with which Jessop acts in the capacity of a joint employer.

about the claims process and availability.

c. Wage Hour is charged with evaluating the claims and creating a proposed schedule of payments to be made from the Fund. At the end of the one-year claims period, Wage Hour will file with the court the proposed schedule of payments to be made from the Fund. Defendants will have fourteen days to object to the proposed schedule of payments. The court will then evaluate the schedule of payments and order a specific payment of funds.

d. If the court accepts payments from the Fund that exceed Defendants' initial deposit of $200,000, Defendants must make additional payments as necessary into the Fund to fulfill all court-approved claims on the Fund. The Department will determine the timing and amount of payments necessary to replenish the Fund.

e. If a balance remains in the Fund after all payments have been made, the balance will be returned to Defendants.

It is so ORDERED,

## ORDER DENYING MOTION TO STAY & MOTION TO RECONSIDER

On December 6, 2016, the court imposed sanctions on Defendants Paragon Contractors Corporation (Paragon) and Brian Jessop. Ten days later, Defendants filed two motions: a Motion for a Stay Pending Appeal (ECF No. 110) and a Motion for Reconsideration (ECF No. 111). To consider these motions, the court temporarily stayed its Order on Sanctions. Because the motions fail to establish that Defendants merit relief, the court denies these motions and lifts the temporary stay (ECF No. 112.)

## I. Motion to Stay Pending Appeal

In determining whether to grant the stay, the court considers the following four factors:

(1) [W]hether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Hilton v. Braunskill, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987).

Here, for the reasons explained in the Government's Opposition to Defendant's Motion for a Stay (ECF No. 116), Defendants fail to establish that the court should stay its order pending appeal.

## II. Motion to Reconsider

A court may reconsider its ruling when there is "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." Servants of Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000). But it "is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing." Id.

Here Defendants ask that the court "revise downward the amount that it ordered to be paid into the DOL's fund to take into account the fact that the Department of Labor already has seized a large sum of money that can be used for compensation." (Def.'s Mot. for Recons. 2, ECF No. 111.) Defendants claim that the proceeds from the Government's seizure and sale of nuts harvested in 2012 should offset the amount it is required to pay in sanctions. But the proceeds of the sale of these nuts, according to a settlement

agreement between Southern Utah Pecan Ranch and the Government, are not available at this time. Because Defendants fail to establish any right to the use of these proceeds, Defendants fail to establish that the court should reconsider its order.

## ORDER

For the reasons explained above, the court DENIES Defendants' Motion for a Stay (ECF No. 110) and Defendants' Motion for Reconsideration (ECF No. 111). Additionally, the court VACATES its temporary stay entered on December 16, 2016. (ECF No. 112.)