**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 13, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

R. ALEXANDER ACOSTA,
Secretary of Labor, United States
Department of Labor,[1]

      Plaintiff-Appellee,

v.

PARAGON CONTRACTORS
CORPORATION; BRIAN JESSOP,
individually,

      Defendants-Appellants,

and

JAMES JESSOP, individually,

      Defendant.

No. 17-4025

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:06-CV-00700-TC)**
_____

Rick J. Sutherland (M. Christopher Moon, with him on the briefs), of
Jackson Lewis PLLC, Salt Lake City, Utah, for Defendants-Appellants.

Maria Van Buren, Counsel for Child Labor and Special FLSA Projects
(Nicholas C. Geale, Acting Solicitor of Labor; Jennifer S. Brand, Associate
Solicitor, and Paul L. Frieden, Counsel for Appellate Litigation, with her

---

[1]    In light of Fed. R. App. P. 43(c)(2), we substitute Mr. R. Alexander
Acosta, the current Secretary of Labor, for Mr. Thomas E. Perez.

on the brief), United States Department of Labor, Washington, D.C., for Plaintiff-Appellee.

_____

Before **LUCERO**, **BACHARACH**, and **MORITZ**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

This case arises out of a 2007 injunction, which prohibited Paragon Contractors Corporation and its president (Mr. Brian Jessop) from engaging in oppressive child labor. The Department of Labor procured a contempt citation, with the district court finding that Paragon and Mr. Jessop had violated the injunction by employing children to harvest pecans. For this violation, the district court sanctioned Paragon and Mr. Jessop by

- appointing a special master to monitor Paragon's ongoing compliance with the injunction and

- ordering Paragon and Mr. Jessop to pay $200,000 into a fund to compensate the children.

Paragon and Mr. Jessop appeal the contempt finding and the sanctions. We conclude that the district court did not err in

- finding that Paragon and Mr. Jessop had violated the injunction by oppressively employing children and

- ordering Paragon and Mr. Jessop to pay $200,000.

But we reverse the district court's appointment of a special master.

2

## I. The Use of Children to Gather Pecans and the Subsequent Contempt Citation

The Southern Utah Pecan Ranch owned over 100 acres of pecan trees in Utah. Through 2007, the Ranch had an informal arrangement with the Fundamentalist Church of Jesus Christ of Latter-Day Saints. After the Ranch harvested pecans from the trees, the Church could send community members to gather the pecans that had fallen to the ground. The gatherers consisted largely of children, who gave half of the fallen pecans to the Church and half to the Ranch.

In 2008, the Ranch began a series of year-long contracts with Paragon. Under these contracts, Paragon obtained responsibility for operating the pecan grove and harvesting the pecans. Paragon received 70% of the proceeds from the sale of the pecans, and the Ranch received 30%.

Though Paragon was to manage the pecan grove, the Church continued to send children to gather the fallen pecans. Paragon hired Mr. Dale Barlow to fulfill the contract with the Ranch. The Church identified Mr. Barlow as the contact person for the gathering operation, and he participated in organizing and managing the Church's efforts to gather the fallen pecans.

In 2012, the Department of Labor investigated Paragon and Mr. Jessop, concluding that they had violated the child-labor provisions of the

Fair Labor Standards Act, 29 U.S.C. § 212. This conclusion led the Department of Labor to allege a violation of the 2007 injunction. This allegation ultimately led to the finding of contempt.

**II.  Did Paragon and Mr. Jessop violate the 2007 injunction?**

Paragon and Mr. Jessop deny violating the 2007 injunction. On this issue, we review the district court's ruling for an abuse of discretion. *United States v. Ford*, 514 F.3d 1047, 1051 (10th Cir. 2008). The court abuses its discretion by relying on an error of law or reaching a clearly erroneous finding of fact. *Id.*

To prevail, the Department of Labor needed to prove by clear and convincing evidence "[1] that a valid court order existed, [2] that the defendant[s] had knowledge of the order, and [3] that the defendant[s] disobeyed the order." *F.T.C. v. Kuykendall*, 371 F.3d 745, 756-57 (10th Cir. 2004) (en banc) (quoting *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998)) (alterations in original). Paragon and Mr. Jessop do not dispute the first two elements, focusing instead on the third element.

The 2007 injunction prohibited Paragon and Mr. Jessop from employing minors "under conditions constituting oppressive child labor." Appellant's App'x at 17. Paragon and Mr. Jessop do not question the oppressiveness of the labor. Instead, they make two arguments:

4

1. The children were not covered by the Fair Labor Standards Act because they were volunteers rather than employees.

2. Even if the children were employees, they were not Paragon's employees; therefore, Paragon and Mr. Jessop are not responsible for the employment of the children.

We reject both contentions.

**A.    Were the children volunteers?**

The first question is whether the children were volunteers rather than employees. We review de novo the district court's determination that the children were "employees," which presents an issue of statutory interpretation. *Johns v. Stewart*, 57 F.3d 1544, 1557 (10th Cir. 1995).

The statutory definition of "employee" is "any individual employed by an employer." 29 U.S.C. § 203(e)(1). And "employ" is defined as "to suffer or permit to work." *Id.* § 203(g). These definitions are "exceedingly broad." *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985).

Paragon and Mr. Jessop contend that the children are not covered by the Fair Labor Standards Act based on (1) the Supreme Court's opinion in *Tony and Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985), and (2) the statutory food-bank exception, 29 U.S.C. § 203(e)(5). We reject both contentions.

**1.    Are the children covered under the Fair Labor Standards Act based on *Alamo Foundation*?**

In *Alamo Foundation*, the Supreme Court discussed the scope of the Fair Labor Standards Act's coverage of employees. The Court noted that the scope of "employee" is "exceedingly broad" but does contain limits. 471 U.S. at 295. For example, the definition of an "employee" does not include "[a]n individual who, 'without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons[.]'" *Id.* (quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947)).

Paragon and Mr. Jessop use this definition, arguing that the children were not "employees" because

- they had no reason to expect compensation and

- they worked "solely for [their] personal purpose or pleasure."

*Id.* According to Paragon and Mr. Jessop, the children freely chose to gather pecans in order to help the Church and the community. Paragon and Mr. Jessop point to testimony from some of the children that they viewed themselves as volunteers and chose whether to participate in the harvest.

The district court disagreed, relying instead on testimony characterizing the children's participation as mandatory. Some children and parents testified that

- the children had been ordered to attend the harvest and

6

- the Church had closed the schools when it was time to harvest the pecans.

In addition, one child stated that if she had not worked, she would have lost her family and been kicked out of the community. Likewise, parents testified that they had sent their children to the harvest because of pressure from the Church, and one father expressed fear that his family would be separated if he had disobeyed. In light of the testimony, the district court's finding of coercion was not clearly erroneous. Given this finding, we conclude that the children did not choose to work for their own "personal purpose or pleasure"; they worked because of coercion.

Paragon and Mr. Jessop respond that even if the children had been coerced, the coercion had come from the Church rather than Paragon. But the *Alamo Foundation* standard does not address the source of the coercion.[2] *Alamo Foundation* states only that individuals working for their own "personal purpose or pleasure" are not covered by the Fair Labor Standards Act. *Id.* (quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947)). Under this standard, the children were not gathering pecans solely for their own personal purpose or pleasure. Therefore, *Alamo Foundation* does not support reversal.[3]

---

[2]    The source of the coercion bears instead on which entity was the employer: the Church or Paragon. We address that inquiry below.

[3]    We need not decide today whether a third party's coercion may affect volunteer status when the employer is unaware of the coercion. That

7

## 2. Does the food-bank exception apply?

Paragon and Mr. Jessop also invoke 29 U.S.C. § 203(e)(5), known as the "food-bank exception," which precludes consideration as "employees" when workers "volunteer their services solely for humanitarian purposes to private non-profit food banks and . . . receive from the food banks groceries." Based on this statute, Paragon and Mr. Jessop argue that the children gathered pecans for the benefit of the Bishop's Storehouse of the Church. For this argument, we may assume (without deciding) that the Bishop's Storehouse constitutes a non-profit food bank. *See* Susan Harthill, *Shining the Spotlight on Unpaid Law-Student Workers*, 38 Vt. L. Rev. 555, 582 (2014) ("[I]n amending [the Fair Labor Standards Act] . . . , Congress chose to only exempt volunteers at food banks and not any other type of nonprofit volunteer."). Even with this assumption, the argument would fail because the children did not "volunteer" their services.

The Fair Labor Standards Act does not define the term "volunteer." We therefore consider the term's ordinary meaning. *See Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1381 (10th Cir. 2009). Dictionaries provide a helpful basis for determining this meaning. *Jones v. C.I.R.*, 560

situation is not present here. The district court found that Paragon and Mr. Jessop had known that the Church was sending children to the harvest, and the evidence supports this finding. For example, Mr. Jessop and Mr. Barlow attended Church meetings where the harvest was discussed, the Church designated Mr. Barlow as the contact person for the harvesting operation, and Mr. Jessop sent his own children to the harvest.

F.3d 1196, 1201 (10th Cir. 2009). The term "volunteer" is commonly defined as an offer to work without solicitation, compulsion, constraint, or influence of another. Webster's Third New International Dictionary 2564 (1993); *see also* The American Heritage Dictionary of the English Language 1941-42 (5th ed. 2011) (defining "volunteer" as "[t]o give or offer to give voluntarily" and "voluntary" as "[d]one or undertaken of one's own free will").

As discussed above, the district court reasonably found that the children had not volunteered to gather pecans. Therefore, the food-bank exception does not apply.[4]

Paragon and Mr. Jessop criticize the use of dictionary definitions to interpret the word "volunteer," asserting that the Supreme Court already interpreted the word in *Alamo Foundation*. This criticism is misguided. *Alamo Foundation*'s definition encompassed the same concept but did not address the term "volunteer" or refer to that term as it is used in the Fair Labor Standards Act. *See Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985). In any event, we have concluded that *Alamo*

---

[4]    The Department of Labor cites 29 C.F.R. § 553.101, which defines the term "volunteer" as it is used in another statutory exception, 29 U.S.C. § 203(e)(4)(A). That definition applies only to individuals who volunteer "for a public agency which is a State, a political subdivision of a State, or an interstate governmental agency," 29 U.S.C. § 203(e)(4)(A). The parties agree that this definition does not apply here.

*Foundation* does not preclude characterization of the children as employees.

* * *

We conclude that the children were "employees," subjecting their employer to the requirements of the Fair Labor Standards Act.

**B.     Who employed the children?**

Classifying the children as employees does not end the inquiry. Paragon and Mr. Jessop argue in two ways that even if the children had been employees, the employer would have been the Church or Mr. Barlow rather than Paragon:

1.     Paragon's contract with the Ranch did not extend to the gathering of pecans from the ground; therefore, Paragon and Mr. Jessop did not employ the children.

2.     Mr. Barlow was an independent contractor; therefore, he alone was responsible for the children's employment.

**1.     Did the contract cover gathering pecans from the ground?**

First, Paragon and Mr. Jessop argue that the contract served only to obligate Paragon to harvest the pecans from the trees. Under this argument, the contract did not govern what happened after the pecans had been harvested from the trees. This argument, if credited, would relieve Paragon of responsibility for what the children did after the tree harvest.

The district court rejected this argument, finding that

- the contract had obligated Paragon to harvest all of the pecans rather than just the pecans in the trees and

10

- the informal arrangement between the Ranch and the Church had ended when Paragon assumed contractual responsibility for the pecan harvest.

We agree with the district court based on the text of the contract, the testimony of a Ranch representative, and Paragon's receipt of profits from the sale of the fallen pecans.[5]

### a. The Text of the Contract

The contract obligated Paragon to manage the pecan groves and to bear the "[c]osts related to the nut gathering/harvesting operation." Appellant's App'x at 296-97. And the compensation provision stated only that "[t]he 2011 pecan crop [would] be sold," with Paragon receiving 70% of the gross proceeds. *Id.* at 298. These provisions did not differentiate between pecans collected from the ground and from the trees.

Paragon and Mr. Jessop rely on the "costs" provision, arguing that the contract would not have singled out the "costs" related to the "nut gathering/harvesting operation" if gathering the pecans from the ground had constituted part of Paragon's contractual obligations.

---

[5] We need not decide the standard of review for this issue. The interpretation of an *unambiguous* contract is reviewed de novo, but the interpretation of an *ambiguous* contract is reviewed for clear error. *See Edwards & Daniels Architects, Inc. v. Farmers' Props., Inc.*, 865 P.2d 1382, 1385 (Utah Ct. App. 1993) (citing *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985)). The district court did not specify the approach that it was using.

11

This argument distinguishes between "harvesting" and "gathering." The contract required Paragon to "harvest" the nuts, which Paragon and Mr. Jessop characterize as a reference to the collection of nuts from the trees. This characterization leads Paragon and Mr. Jessop to deny any contractual obligation to "gather" nuts, which they regard as a reference to the collection of nuts from the ground. For the nuts on the ground, Paragon and Mr. Jessop insist that their responsibilities had been limited to the payment of some of the gathering costs.

Even if the costs provision had differentiated between "harvesting" and "gathering," the provision had allocated the costs to Paragon for both harvesting and gathering. By assigning the contract's costs to Paragon for both harvesting and gathering, the contract suggested that Paragon bore responsibility for both activities. And Paragon and Mr. Jessop identify nothing in the contract that would

- restrict Paragon's obligations to harvesting pecans from trees or

- disclaim responsibility to gather pecans from the ground.

Accordingly, the contract language suggests coverage of pecans collected from the ground as well as from the trees.

12

### b. Testimony by Mr. Freeman

The district court could rely not only on the contract language but also on testimony by Mr. Norman Freeman, the Ranch representative who had dealt with Paragon. Mr. Freeman testified that

- the contract had obligated Paragon to gather the pecans from the ground and ended the Ranch's informal arrangement with the Church and

- Mr. Jessop had known that Paragon was contractually obligated to harvest all of the pecans, including those that had fallen to the ground.

Paragon and Mr. Jessop challenge Mr. Freeman's testimony as internally inconsistent and in conflict with Mr. Barlow's testimony.

According to Paragon and Mr. Jessop, Mr. Freeman contradicted himself when he acknowledged that he had not objected after seeing children collect pecans. But Mr. Freeman clarified that he had assumed that the children were helping Paragon fulfill its contractual obligations.

Paragon and Mr. Jessop also point to Mr. Freeman's admission that he could not recall a specific discussion with Mr. Jessop about collecting the fallen pecans. But Mr. Freeman explained that he had regarded the contract as so clear that there would have been little reason to remind Mr. Jessop of Paragon's obligation to collect the nuts from the ground.

Paragon and Mr. Jessop also rely on testimony by Mr. Barlow, who stated that the Ranch's informal arrangement with the Church had continued after Paragon took over the management of the grove. But the

13

district court did not believe Mr. Barlow, and we have little reason to question the court's assessment of credibility. *See United States v. Quaintance*, 608 F.3d 717, 723 (10th Cir. 2010) ("[W]e generally grant 'great deference' to a district court's credibility assessments." (quoting *Wessel v. City of Albuquerque*, 463 F.3d 1138, 1145 (10th Cir. 2006))). In our view, the district court did not clearly err in finding that the parties had understood the contract to include the harvesting of fallen pecans.

### c.     Paragon's Receipt of Profits

The district court could also reasonably rely on the fact that Paragon had profited from the ground pecans. Those pecans were comingled with the other pecans and sold together, with Paragon receiving 70% of the total proceeds. Paragon and Mr. Jessop do not explain why they would receive proceeds from the sale of the fallen pecans if they had been excluded from the contract.

\* \* \*

The district court reasonably determined that the contract had required Paragon to collect the fallen pecans. Thus, the district court could reasonably find that the children had been helping Mr. Barlow, through his status with Paragon, to fulfill Paragon's contractual obligations.

### 2.     Was Mr. Barlow an independent contractor?

Paragon and Mr. Jessop also characterize Mr. Barlow as an independent contractor, making his employment of the children his

14

responsibility rather than Paragon's or Mr. Jessop's.[6] We conclude that Mr. Barlow was an employee of Paragon, not an independent contractor;[7] therefore, the children were also employees of Paragon.

### a. The Pertinent Factors

In determining whether an individual was an independent contractor or employee, we focus on the economic realities and the worker's economic dependence on the business. *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998). The economic realities ordinarily turn on six factors:

1. The degree of control exercised by the alleged employer over the worker,

2. the worker's opportunity for profit or loss,

3. the worker's investment in the business,

4. the permanence of the working relationship,

5. the degree of skill required to perform the work, and

6. the extent to which the work is an integral part of the alleged employer's business.

---

[6] Mr. Barlow's status as an independent contractor would not automatically preclude the children from being considered employees of Paragon and Mr. Jessop. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964); *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235, 237 (5th Cir. 1973).

[7] The district court did not decide whether Mr. Barlow had been an independent contractor, concluding instead that Mr. Barlow had been an agent of Paragon and Mr. Jessop under Utah agency law. But we may affirm the district court's ruling on any ground supported by the record. *Stillman v. Teachers Ins. & Annuity Ass'n Coll. Ret. Equities Fund*, 343 F.3d 1311, 1321 (10th Cir. 2003).

*Id.*

The overarching inquiry is based on the totality of the circumstances, and no single factor is dispositive. *Johnson v. Unified Gov't of Wynadotte Cty.*, 371 F.3d 723, 729 (10th Cir. 2004). In considering these circumstances, we review the district court's underlying factual findings for clear error. *Baker*, 137 F.3d at 1441. But we regard the ultimate classification (employee or independent contractor) as a matter of law. *Id.*; *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 571 (10th Cir. 1994).

### b.    Degree of Control

The first factor involves the degree of Paragon's control over Mr. Barlow. In evaluating this factor, we consider various considerations such as Mr. Barlow's independence in setting his own work hours and other conditions and details of his work, the extent of Paragon's supervision of Mr. Barlow, and the degree of Mr. Barlow's ability to work for other employers. *See Baker*, 137 F.3d at 1441; *Johnson*, 371 F.3d at 729-30; *Henderson*, 41 F.3d at 570.

This factor indicates status as an independent contractor. Mr. Barlow was hired to manage the pecan grove, and he could set his own hours and determine how best to perform his job within broad parameters. Although Mr. Barlow periodically reported to Paragon and would occasionally request assistance, Paragon did not substantially supervise Mr. Barlow's work. In addition, Mr. Barlow could work for other employers. For

16

example, he testified that he had engaged in flooring and plumbing work for other companies and had facilitated a similar nut-gathering arrangement between the Church and another nearby nut grove.

In our view, the evidence indicates that Paragon did not exercise substantial control over Mr. Barlow's work. As a result, this factor supports classification of Mr. Barlow as an independent contractor rather than an employee. *See Aimable v. Long & Scott Farms*, 20 F.3d 434, 441 (11th Cir. 1994) ("Control arises, we believe, when the farmer goes beyond general instructions, such as how many acres to pick in a given day, and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work.").

c.    **Opportunity for Profit or Loss**

In evaluating the second factor, we consider whether Mr. Barlow had the ability to profit based on his performance. Such an ability is "consistent with the characteristics of being [an] independent businessm[a]n." *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1441 (10th Cir. 1998). This factor indicates that Mr. Barlow was an employee rather than an independent contractor.

Mr. Barlow was paid only a flat fee for managing the pecan grove. Thus, he could not increase or decrease his profit based on how well he did his job. *See id.* (holding that this factor supported employee status because the workers had been paid at a fixed rate and had not incurred any risk of

17

loss); *Dole v. Snell*, 875 F.2d 802, 810 (10th Cir. 1989) (holding that this factor supported employee status because earnings had not depended on the workers' "judgment or initiative").

### d.    Investment in the Business

The third factor is the extent of Mr. Barlow's investment in the business. The mere fact that workers supply their own tools or equipment does not establish status as independent contractors; rather, the relevant "investment" is "the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself." *Dole*, 875 F.2d at 810.

To analyze this factor, we compare the investments of the worker and the alleged employer. *Baker*, 137 F.3d at 1442. This factor points heavily to status as an employee. The supplies and equipment were provided by the Ranch, not Mr. Barlow.[8] His only work-related expenses were for travel to and from the pecan farm. By contrast, Paragon bore the contractual obligation to pay for equipment maintenance, fertilizer, pest control, and utilities.

Paragon and Mr. Jessop point out that Mr. Barlow supplied buckets for the families that had not brought buckets. But this expense was negligible. We consider Mr. Barlow's negligible expense as a factor that

---

[8]    Mr. Barlow stated that he had provided his truck to manage the harvest. But he conceded that he had later obtained reimbursement from Paragon.

strongly supports Mr. Barlow's status as an employee rather than an independent contractor.

### e.    Permanence of the Working Relationship

The fourth factor addresses the permanence of Mr. Barlow's relationship with Paragon. For purposes of this factor, "'[i]ndependent contractors' often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and of indefinite duration." *Dole v. Snell*, 875 F.2d 802, 811 (10th Cir. 1989). This factor weighs heavily in favor of employee status.

Paragon and Mr. Jessop contend that Mr. Barlow was employed temporarily because he was hired for only one harvesting season at a time. But "'[m]any seasonal businesses necessarily hire only seasonal employees, [and] that fact alone does not convert seasonal employees into seasonal independent contractors.'" *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) (quoting *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987)) (alterations in original). Thus, even when the relationship is short, the worker may be considered an employee when the relationship is shortened because of the job's "intrinsic nature" rather than the worker's "choice or decision." *Id.*

Mr. Barlow was hired for a relatively short time period (the harvest season). But his employment was permanent for the duration of each

19

harvest season. This factor supports Mr. Barlow's status as an employee rather than an independent contractor. *See Lauritzen*, 835 F.2d at 1537 ("[H]owever temporary the relationship may be it is permanent and exclusive for the duration of that harvest season.").[9]

### f. Degree of Skill Required to Perform the Work

The fifth factor addresses the degree of skill that Mr. Barlow needed for the job. For this factor, we consider whether the job contains a "requirement of specialized skills"; if such a requirement exists, the worker is more likely to be considered an independent contractor. *Dole v. Snell*, 875 F.2d 802, 811 (10th Cir. 1989). These specialized skills are distinct from general "'occupational skills'" that "'any good employee in any line of work must [have].'" *Id.* (quoting *Lauritzen*, 835 F.2d at 1537). This factor supports consideration of Mr. Barlow as an employee rather than an independent contractor.

Mr. Barlow testified that his job had included attending to the day-to-day operations of the pecan grove, providing security, performing general maintenance (such as watering, pruning, and trimming the trees), and cleaning debris out of the nuts. Paragon and Mr. Jessop do not identify any specialized skills needed for these tasks. As a result, this factor also supports classification of Mr. Barlow as an employee rather than an

---

[9]  The temporary nature of the relationship was caused not by Mr. Barlow's choice to seek work elsewhere, but by the seasonal nature of the harvest.

independent contractor. *See id.* ("The lack of the requirement of specialized skills is indicative of employee status.")

**g.    Integral Part of the Employer's Business**

The last factor turns "on whether workers' services are a necessary component of the business." *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1443 (10th Cir. 1998). If Mr. Barlow's work was essential to Paragon's business, this factor would support consideration of Mr. Barlow as an employee of Paragon.

The district court found that "Paragon's usual business is construction," which the Department of Labor does not dispute. *Perez v. Paragon Contractors Corp.*, 233 F. Supp. 3d 1234, 1237 (D. Utah 2017). Because Mr. Barlow's management of the pecan grove was not integral to the bulk of Paragon's business, this factor supports consideration of Mr. Barlow as an independent contractor.

But this factor carries little weight here because of the unique nature of Mr. Barlow's work. That work was not essential to Paragon's *overall* business, but his management of the pecan grove *was* essential to Paragon's pecan-harvesting business. *See Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1537-38 (7th Cir. 1987) (concluding that for a pickle farm, picking the pickles is an integral part of the business, supporting classification of the pickers as employees). Accordingly, this factor provides only marginal support for status as an independent contractor.

21

* * *

Considering the totality of the circumstances, we conclude that Mr. Barlow depended economically on Paragon's business "for the opportunity to render service" and was not "in business for [himself]." *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1443 (10th Cir. 1998). Therefore, Mr. Barlow was an employee, not an independent contractor, of Paragon.

### 3. Were the children employees of Paragon and Mr. Jessop?

Because Mr. Barlow was employed by Paragon, the children would also be considered employees of Paragon. *See Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327 (5th Cir. 1985) (noting that if the alleged contractor were considered an employee of the defendant, "it would necessarily follow" that the contractor's employees would also be considered employees of the defendant).

* * *

We therefore conclude that

- Paragon had employed the children and

- the district court correctly concluded that Paragon and Mr. Jessop had violated the 2007 injunction by employing the children.

## III. Were the district court's sanctions permissible?

Paragon and Mr. Jessop also challenge the contempt sanctions. We agree with Paragon and Mr. Jessop regarding the appointment of a special

22

master. But we reject the challenge regarding the order to pay into the fund.

## A.    What is the standard of review?

The district court has "inherent power to enforce compliance with [its] lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). In exercising this power, the court enjoys broad discretion. *Rodriguez v. IBP, Inc.*, 243 F.3d 1221, 1231 (10th Cir. 2001). We accordingly review the court's imposition of sanctions for an abuse of discretion. *Id.* The court abuses its discretion by committing an error of law; as a result, we engage in de novo review on matters of law. *Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 370 (10th Cir. 1996).

## B.    What are the purposes of civil-contempt sanctions?

Civil-contempt sanctions may be imposed only

- "'to compel or coerce obedience to a court order'" or

- "'to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance.'"

*O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992) (quoting *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147 (9th Cir. 1983)).

Here, the district court imposed both types of sanctions. First, the court imposed a coercive sanction, appointing a special master to monitor

23

compliance with the injunction. Second, the court imposed a compensatory sanction, ordering Paragon and Mr. Jessop to pay $200,000 into a fund to compensate the children for their labor. Paragon and Mr. Jessop challenge both sanctions.

## C. Was appointment of a special master permissible?

First, Paragon and Mr. Jessop argue that the district court exceeded its authority by appointing a special master to monitor compliance with the injunction. We agree.

The district court can impose coercive sanctions designed to compel obedience to a court order. But because coercive sanctions seek to avoid the "'harm threatened by continued contumacy,'" the sanctions can remain only until the contemnor complies with the order. *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947)). Thus, the sanctioned party must be able to immediately end the sanction by complying with the court order. *See id.* at 1211-12; *see also Shillitani v. United States*, 384 U.S. 364, 370-71 (1966) (noting that a coercive sanction must give the contemnor an "opportunity to purge himself of contempt").

The district court based its sanction on the risk that Paragon and Mr. Jessop might again employ children. The court stressed three facts:

1. Paragon and Mr. Jessop had begun profiting from child labor on the Ranch shortly after getting caught using child labor in the construction industry.

24

2.     Paragon and Mr. Jessop had tried to conceal their violation of the injunction by telling employees to lie, hiding children during inspections, and failing to maintain proper records.

3.     Paragon and Mr. Jessop had flouted subpoenas and testified untruthfully.

The district court was understandably frustrated with what it saw as repeated and willful violations by Paragon and Mr. Jessop. But no evidence existed regarding Paragon's employment of children at the time of the district court's sanction, for Paragon had ended its relationship with the Ranch years earlier.[10] The sanction therefore did not comply with the requirement of "continued contumacy."

Because there was no evidence of child labor at the time of the sanction, there was nothing that Paragon or Mr. Jessop could do to bring themselves into compliance. As a result, Paragon and Mr. Jessop had no way to purge themselves of contempt. *See O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211-12 (10th Cir. 1992).

\* \* \*

---

[10]    The district court stated that "[d]efendants [had] left the court with no assurance that they [were] in compliance with its order or that they [would] . . . comply in the future." *Perez v. Paragon Contractors Corp.*, 233 F. Supp. 3d 1234, 1240 (D. Utah 2017). This statement suggests that the district court might have believed that Paragon and Mr. Jessop were currently noncompliant. But the court pointed to no evidence of current noncompliance, and a factfinder cannot speculate about a current violation without evidence. *See Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521 (10th Cir. 1987).

25

A coercive sanction cannot be imposed on a party that is currently in compliance just to ensure future compliance. Accordingly, the district court abused its discretion in appointing a special master to monitor compliance.[11]

### D.    Was the compensatory sanction permissible?

Paragon and Mr. Jessop also challenge the district court's compensatory sanction. The court ordered Paragon and Mr. Jessop to compensate the children by paying $200,000 into a fund managed by the Department of Labor. The Department would then allow the children and their representatives to present evidence of their labor and obtain compensation from the fund.

The district court can impose a sanction "'to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance[.]'" *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992) (quoting *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147 (9th Cir. 1983)) (alteration in original); *see McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949) (noting that the district court may order contemnors "to pay the damages caused by their violations of the decree"). The amount of the compensatory sanction must be based upon the "'actual losses sustained as a result of the contumacy.'"

---

[11]    We do not address whether the district court could have modified the injunction to require a special master.

26

*O'Connor*, 972 F.2d at 1211 (quoting *Perfect Fit Indus. v. Acme Quilting Co.*, 646 F.2d 800, 810 (2d Cir. 1981)). Therefore, a direct causal relationship must exist between the amount of damages and the violation of an injunction. *See id.* This question of causation underlies the parties' dispute over the sanction.

We have not articulated a precise test for causation in this context. But we are guided by the Supreme Court's recent opinion in *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017). *Goodyear* involved a district court's order requiring an offending party to pay the other party's legal fees. 137 S. Ct. at 1183-84. The Supreme Court held that the sanction must be limited to the "fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith." *Id.* at 1184. The Court characterized this causal connection as a "but-for test." *Id.* at 1187.

Paragon and Mr. Jessop deny a causal connection between the sanction and the violation of the injunction.[12] This distinction, according to Paragon and Mr. Jessop, is reflected in two different statutory violations: (1) employment of child labor under oppressive conditions and (2) violation of minimum-wage requirements. *See Gemsco, Inc. v. Walling*, 324

---

[12]  In their reply brief, Paragon and Mr. Jessop argue that they lacked notice that violation of the 2007 injunction could result in a fund to pay child laborers. But this argument did not appear in the opening brief. As a result, we decline to consider this argument. *Bronson v. Swenson*, 500 F.3d 1099, 1104 (10th Cir. 2007).

27

U.S. 244, 261-62 (1945) (noting that the child-labor provisions of the Fair Labor Standards Act are independent of the minimum-wage provisions).

Paragon and Mr. Jessop argue that the compensatory sanction effectively served as a sanction for the failure to pay minimum wages to the children. But the injunction did not prohibit Paragon and Mr. Jessop from violating the minimum-wage provisions; the injunction served only to prohibit violations of the child-labor provisions. Because the sanction must be causally related to violation of the injunction, Paragon and Mr. Jessop argue that an order to pay unpaid wages serves as an impermissible sanction for a child-labor violation. We disagree.

Paragon and Mr. Jessop point out that unpaid wages are not *necessarily* the direct result of a child-labor violation. After all, if Paragon and Mr. Jessop had paid the children minimum wage for their work, the injunction against oppressive child labor would still have been violated.

But we are not facing such a case. Here, the unpaid wages *were* the direct result of the child-labor violation. If Paragon and Mr. Jessop had not employed the children, the children would not have performed unpaid labor. In other words, the violation of the injunction (employment of child labor under oppressive conditions) was the "but-for" cause of the children's unpaid labor.

Paragon and Mr. Jessop essentially assume that the damages from a child-labor violation and the damages from a minimum-wage violation are

28

mutually exclusive. This approach posits that because unpaid wages constitute the damages from a minimum-wage violation, the unpaid wages cannot also constitute damages from a child-labor violation.

But these damages are not mutually exclusive. In this case, the children's unpaid labor resulted directly from employment of the children; accordingly, the "'actual losses sustained as a result of the [child-labor violation]'" include the value of the children's uncompensated work.[13] *O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992).

For these reasons, we conclude that the district court acted within its discretion in ordering Paragon and Mr. Jessop to pay into a fund to compensate the children for their work.

## IV. Conclusion

We affirm in part and reverse in part.

We affirm the district court's conclusion that Paragon and Mr. Jessop violated the 2007 injunction prohibiting the use of oppressive child labor.

---

[13] Paragon and Mr. Jessop argue that unpaid wages served as an impermissible sanction because such wages could be sought in a separate proceeding against Paragon and Mr. Jessop for minimum-wage violations. But the mere fact that certain damages could also be recovered in a separate proceeding does not prevent the district court from ordering the same payment as a sanction for contempt. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 194 (1949) (approving the district court's contempt sanction, which had ordered payment of damages, noting that "[t]he fact that another suit might be brought to collect the payments is, of course, immaterial").

The children were not volunteers, and Paragon and Mr. Jessop employed the children.

We further affirm the district court's order for Paragon and Mr. Jessop to pay into a fund to compensate the children. In our view, this order constituted a permissible compensatory sanction.

But we reverse the district court's appointment of a special master to monitor compliance with the injunction. This appointment exceeded the court's authority to impose coercive sanctions.