RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0072p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

R. ALEXANDER ACOSTA, Secretary of Labor,

*Plaintiff-Appellee*,

*v.*

CATHEDRAL BUFFET, INC.; ERNEST ANGLEY,

*Defendants-Appellants*.

No. 17-3427

---

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:15-cv-01577—Benita Y. Pearson, District Judge.

Argued:  December 6, 2017

Decided and Filed:  April 16, 2018

Before:  SILER, KETHLEDGE, and THAPAR, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Todd A. Mazzola, RODERICK LINTON BELFANCE, LLP, Akron, Ohio, for Appellants.  Mary E. McDonald, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellee.  **ON BRIEF:**  Todd A. Mazzola, William G. Chris, Lawrence R. Bach, RODERICK LINTON BELFANCE, LLP, Akron, Ohio, for Appellants.  Mary E. McDonald, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellee.

SILER, J., delivered the opinion of the court in which KETHLEDGE and THAPAR, JJ., joined.  KETHLEDGE, J. (pp. 11–13), delivered a separate concurring opinion.

---

**OPINION**

---

SILER, Circuit Judge.  The Grace Cathedral church operates a restaurant on its Cuyahoga Falls, Ohio, campus called Cathedral Buffet.  For many years, Cathedral Buffet was open to the public and was partially staffed by unpaid church members.  Following a Department of Labor (DOL) suit and a bench trial, the district court found that the restaurant's use of unpaid labor violated the minimum wage requirement of the Fair Labor Standards Act (FLSA).

However, to be considered an employee within the meaning of the FLSA, a worker must first expect to receive compensation.  *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985); *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947).  It is undisputed that the volunteers who worked at Cathedral Buffet had no such expectation.  We therefore REVERSE and REMAND.

I.

Cathedral Buffet is organized as an Ohio for-profit corporation.  The restaurant's sole shareholder is Grace Cathedral, Inc., a 501(c)(3) non-profit religious organization.  Despite its for-profit status, Cathedral Buffet does not generate a profit, and Grace Cathedral subsidizes the restaurant.[1]  Grace Cathedral's pastor, Reverend Ernest Angley, also serves as the president of Cathedral Buffet.

The DOL's Wage and Hour Division began investigating Cathedral Buffet in 2014, reviewing the restaurant's employment practices for a period stretching back two years.[2]  During

---

[1]Prior to Cathedral Buffet's incorporation in 2013, Winston Broadcasting Network, Inc. owned Cathedral Buffet.  Grace Cathedral is also the sole shareholder of Winston Broadcasting Network.  The district court found that, despite this change in ownership, "[m]any aspects of the Buffet have remained constant for the past nineteen years," and imposed liability upon Cathedral Buffet, Inc. as Winston Broadcasting's successor-in-interest.  Cathedral Buffet does not raise successor liability as an issue on appeal.

[2]The 2014 investigation was not Cathedral Buffet's first encounter with the DOL.  In 1999, the agency alleged the restaurant had committed many of the same FLSA violations.  The parties settled the 1999 case, and Cathedral Buffet agreed to pay $37,037.28 in back wages and not to violate the FLSA in the future.  For a time following the 1999 investigation, volunteers were issued checks for their work at the restaurant.  However, several volunteers testified that they were required to endorse and return the checks to Grace Cathedral's secretary.  DOL

that period, the restaurant separated its workers into two classes, "employees" and "volunteers." Volunteers performed many of the same restaurant-related tasks as employees: cleaning, washing dishes, serving cake, chopping vegetables, and manning the cash register. However, there was one meaningful distinction between employees and volunteers. Employees received an hourly wage; volunteers did not.

Reverend Angley recruited volunteers from the church pulpit on Sundays. Sonya Neale, the restaurant's manager, would tell Angley when the restaurant was shorthanded, and before his sermon, Angley would announce to the congregation that more volunteers were needed. Angley said the restaurant was "the Lord's buffet," and "[e]very time you say no, you are closing the door on God." He suggested that church members who repeatedly refused to volunteer at the restaurant were at risk of "blaspheming against the Holy Ghost," which was an unforgivable sin in the church's doctrine. Ushers would pass around slips of paper, and parishioners interested in volunteering would write down their phone number and hand it in.

Church members would then receive calls from Cathedral Buffet managers, and sometimes Angley himself, asking them to volunteer. The managers would work around the volunteers' schedules, ensuring they were free during their assigned shifts. Managers were instructed to tell prospective volunteers that Angley would find out if they refused to work. According to church member Alishea Gay, on one occasion when she did not return a phone call, Angley called her directly and asked her to work. Gay agreed to work because she "feared failing God."

The DOL filed suit after concluding Cathedral Buffet violated the FLSA by using unpaid volunteers and by failing to keep records of the hours they worked. After a three-day bench trial, the district court issued its Findings of Fact and Conclusions of Law. *Hugler v. Cathedral Buffet*, No. 5:15-CV-1577, 2017 WL 1287422 (N.D. Ohio Mar. 29, 2017). It held that Cathedral Buffet's religious affiliation did not exempt it from FLSA coverage because the restaurant was a for-profit corporation engaged in commercial activity. *Id.* at *7-8 (citing *Alamo*, 471 U.S. at 296-99, 302). Applying the economic realities test, the district court concluded that the church

investigators returned to Cathedral Buffet in 2003 as part of the agency's recidivism initiative and found no violations.

member volunteers were employees under the FLSA. *Id.* at \*8-11. In the court's view, "The Buffet's constant solicitation of volunteer labor, Reverend Angley's admissions that the use of volunteer labor was intended to save money, and the volunteers' feelings of pressure and coercion to provide the labor all demonstrate that the volunteers were actually employees." *Id.* at \*11. The court also noted that the volunteers were "clearly integral to the Buffet's operations," and that the restaurant's management exerted a "high level of supervision and control . . . over the volunteers." *Id.* The court rejected Cathedral Buffet's argument that workers need not be paid minimum wage if they have no expectation of compensation, saying that "[s]uch a reading of the FLSA . . . clearly violates the intent and purpose of the Act" and would run afoul of the Supreme Court's holding in *Alamo. Id.*

Because Cathedral Buffet failed to keep accurate records, the district court adopted the DOL's estimate of the volunteers' back wages, $194,253.95. *Id.* at \*15. The district court also awarded the DOL an equal amount of liquidated damages, for a total of $388,507.90, because Cathedral Buffet failed to demonstrate a good faith effort to comply with the FLSA. *Id.* at \*15-16. Finally, the court enjoined Cathedral Buffet and Angley from further violations of the FLSA and ordered that they "shall not solicit or coerce . . . any employee – including those workers classified as 'volunteers' – to return or to offer to return to the Defendants or to someone else on behalf of the Defendants any money" awarded to the employee by the judgment. This appeal followed.

II.

Following a bench trial, "we review a district court's factual findings for clear error and its legal conclusions de novo." *Muniz-Muniz v. United States Border Patrol*, 869 F.3d 442, 444 (6th Cir. 2017) (quoting *Calloway v. Caraco Pharm. Labs., Ltd.*, 800 F.3d 244, 251 (6th Cir. 2015)). "A district court's factual findings are clearly erroneous if, based on the entire record," the reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Shelby Cty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 364-65 (6th Cir. 2009) (citations and internal quotation marks omitted).

III.

A.

The FLSA mandates that "[e]very employer shall pay to each of his employees who . . . is employed in an enterprise engaged in commerce or in the production of goods for commerce" a minimum wage set by Congress. 29 U.S.C. § 206(a). An "[e]nterprise engaged in commerce" is one that, among other things, "has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce" or "whose annual gross volume of sales made or business done is not less than $500,000." *Id.* § 203(s)(1)(A)(i), (ii). The restaurant concedes that it is a covered enterprise under the FLSA. Thus, the only remaining question is whether the church member volunteers are employees within the meaning of the Act.

The FLSA defines an "employee" as "any individual employed by an employer," *id.* § 203(e)(1), and "employ" as "to suffer or permit to work," *id.* § 203(g). These are wide-ranging definitions; indeed, the Supreme Court has stated that "[a] broader or more comprehensive coverage of employees . . . would be difficult to frame." *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945). The statutory language "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Mendel v. City of Gibraltar*, 727 F.3d 565, 569 (6th Cir. 2013) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)).

To determine whether a worker is an FLSA employee, we typically look to the economic realities of the business relationship in light of all the relevant factors. *See, e.g.*, *Ellington v. City of East Cleveland*, 689 F.3d 549, 555-56 (6th Cir. 2012). However, Cathedral Buffet urges us to eschew this approach based upon the Supreme Court's holding in *Alamo*, 471 U.S. at 302, a case with similar facts.

There, the Tony and Susan Alamo Foundation, a non-profit religious organization, operated a number of commercial businesses to support its ministry. *Id.* at 292. The Foundation staffed those businesses with persons it called "associates," who were mostly rehabilitated "drug addicts, derelicts, or criminals." *Id.* Associates received no wages, but the Foundation provided them with food, clothing, and shelter. *Id.*

The Supreme Court held that the associates were entitled to minimum wage under the FLSA. First, the Court found that the Foundation was a covered enterprise under the Act because its "businesses serve[d] the general public in competition with ordinary commercial enterprises." *Id.* at 299. When the FLSA was expanded to cover "enterprises" in 1961, the Court said, "[t]here was . . . broad congressional consensus that ordinary commercial businesses should not be exempted from the Act simply because they happened to be owned by religious or other nonprofit organizations." *Id.* at 297-98.

The *Alamo* Court also concluded that the Foundation's associates were employees within the meaning of the FLSA. *Id.* at 301-02. In an earlier case, *Portland Terminal*, 330 U.S. at 153, the Court held that enrollees in a week-long railyard training course were not FLSA employees because they participated for their own benefit, had no expectation of compensation, and provided the railroads with no "immediate advantage." In contrast, the *Alamo* Court found that, although the Foundation's associates did not expect to receive wages, they had an implied agreement for compensation with the Foundation in the form of in-kind benefits and were sometimes wholly dependent upon the Foundation for several years. *Alamo*, 471 U.S. at 301.

Important for our purposes, the *Alamo* Court rejected the Foundation's argument that requiring it to pay the associates would chill other volunteer activities normally associated with religious organizations. The Court wrote that "[t]he Act reaches only the 'ordinary commercial activities' of religious organizations, and only those who engage in those activities in expectation of compensation." *Id.* at 302 (quoting 29 C.F.R. § 779.214 (1984)).

In this case, although Cathedral Buffet stresses its religious nature, it does not contest the district court's determination that the restaurant is an FLSA "enterprise" because it engages in competitive commercial activity. Instead, Cathedral Buffet argues that its volunteers are distinguishable from the associates in *Alamo* because they did not expect to receive any type of compensation. Under Cathedral Buffet's reading of *Alamo*, to find that its volunteers are FLSA employees, we must first find that they worked "in expectation of compensation." *Id.* Because that requirement is not met, the restaurant says, the volunteers are not employees, and the court need not proceed to the economic realities test.

We agree that a volunteer's expectation of compensation is a threshold inquiry that must be satisfied before we assess the economic realities of the working relationship. The Supreme Court held as much in *Portland Terminal* when it defined a volunteer as a "person who, *without promise or expectation of compensation*, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit." *Portland Terminal*, 330 U.S. at 152 (emphasis added). The *Alamo* Court reiterated this test, making clear that when a religious organization undertakes a commercial endeavor, its workers are only covered under the FLSA if they "engage in those activities in expectation of compensation." *Alamo*, 471 U.S. at 302. We are, of course, bound by the Supreme Court's interpretation of the FLSA. *See Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 312 (1994) ("It is this Court's responsibility to say what a statute means, and once the Court has spoken, it is the duty of other courts to respect that understanding of the governing rule of law.").

In the past, we have stressed that "[t]he issue of the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity." *Mendel*, 727 F.3d at 569 (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984)). But our earlier cases dealt with the distinction between employees and independent contractors. *See, e.g.*, *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 804-05 (6th Cir. 2015); *see also Marie v. Am. Red Cross*, 771 F.3d 344, 352 (6th Cir. 2014) (recognizing in a Title VII case that, "because volunteers do not usually receive compensation in the traditional sense, they are quite differently situated than either employees or independent contractors"). In that context, it is a foregone conclusion that the workers, whether employees or independent contractors, expect to receive compensation. Thus, the threshold question of remuneration becomes irrelevant, and we proceed to determine whether the workers, "as a matter of economic reality[,] are dependent upon the business to which they render service." *Keller*, 781 F.3d at 807 (citations omitted). Here, however, *Portland Terminal* and *Alamo* plainly require us to first ask whether Cathedral Buffet's volunteers worked in "expectation of compensation." *Alamo*, 471 U.S. at 302; *Portland Terminal*, 330 U.S. at 152.

They did not. It is undisputed that the volunteers were not economically dependent upon Cathedral Buffet in any way; the parties stipulated as much before trial. The volunteers neither

expected nor received any wages or in-kind benefits in exchange for their service. They were not even allowed to accept tips from customers. Put simply, there was no economic relationship between the restaurant and the church member volunteers. Because the volunteers did not work in expectation of compensation, the threshold remuneration requirement fails.

B.

Cathedral Buffet says this should be the end of the story—because the volunteers did not expect to be compensated, they cannot be FLSA employees. The DOL contends, however, that a showing of coercion can satisfy the expectation-of-remuneration requirement. And because the district court found that the volunteers were coerced, it argues, the volunteers are employees, despite their lack of actual or expected compensation.

The DOL's argument finds some support in the *Alamo* decision. The Court expressed concern that allowing workers to opt out of FLSA protection would open the door to coercion: "If an exception to the Act were carved out for employees willing to testify that they performed work 'voluntarily,'" the Court said, "employers might be able to use superior bargaining power to coerce employees to make such assertions, or to waive their protections under the Act." *Alamo*, 471 U.S. at 302.

We agree that in some circumstances, a showing of coercion might be sufficient to overcome a volunteer's lack of expected compensation and bring her within the protections of the FLSA. But those circumstances are not present in this case. The type of coercion with which the FLSA is concerned is economic in nature, not societal or spiritual.

Congress's primary goal in enacting the FLSA "was to eliminate, as rapidly as practicable, substandard labor conditions throughout the nation." *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 510 (1950); *see Keller*, 781 F.3d at 806 ("The FLSA aimed to correct labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers . . . ." (citations and internal quotation marks omitted)). To "protect all covered workers from substandard wages and oppressive working hours," *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981), the Act requires that employers pay their employees a minimum wage set by Congress, *Ellington*, 689

F.3d at 552 (citing 29 U.S.C. § 206(a)).  But although the FLSA might aim to curb the societal ills caused by low wages, it does so through a comprehensive system of economic regulations. The Act does not go so far as to regulate when, where, and how a person may volunteer her time to her church.  After all, the giving of one's time and money through religious obligation is a common tenet of many faiths.  For instance, the Bible calls upon Christians to "use whatever gift you have received to serve others, as faithful stewards of God's grace in its various forms." 1 Peter 4:10 (NIV).  In the Islamic faith, believers are instructed to "show kindness unto parents, and unto near kindred, and orphans, and the needy."  The Qur'an, *An-Nisa* 4:36.

The Tenth Circuit's recent decision in *Acosta v. Paragon Contractors Corp.*, 884 F.3d 1225 (10th Cir. 2018), is readily distinguishable.  There, a Utah pecan ranch had an agreement with the Fundamentalist Church of Jesus Christ of Latter-Day Saints, whereby the Church would send community members—mostly children—to gather fallen pecans that had been missed in the harvest.  *Id.* at 1230.  The Tenth Circuit rejected the ranch's argument that the children were not employees under *Alamo* and *Portland Terminal*, agreeing instead with the district court that the children worked at the ranch because they were coerced to do so by their parents, community, and the Church.  *Id.* at 1231-32.  But *Paragon*, unlike the case at bar, involved the use of child labor, and the children were not providing labor to a church-affiliated enterprise.  Further, the court devoted only a small portion of its opinion to the issue of coercion, and did not squarely address the issue of spiritual coercion, as we are called to do today.

Because we hold that spiritual coercion cannot stand in for the economic coercion that the FLSA and the *Alamo* decision require, we need not decide whether the district court erred by finding that the Cathedral Buffet volunteers were actually coerced.

## C.

The DOL suggests that allowing Cathedral Buffet to rely on unpaid labor gives it an unfair advantage over other restaurants in the Cuyahoga Falls area.  That may very well be the case.  But the *Alamo* decision also counsels us to accommodate the "ordinary volunteerism" in which many organizations like Grace Cathedral engage.  *Alamo*, 471 U.S. at 303.  The Court listed several examples of volunteer work that would not fall within the purview of the FLSA:

"driv[ing] the elderly to church, serv[ing] church suppers, or help[ing] remodel a church home for the needy." *Id.* at 302. These activities could all be seen as competing with other businesses, yet they are still exempted from FLSA coverage because the workers do not expect to receive an economic benefit in return for their service. A church van competes with a taxi service. A Catholic fish fry competes with a fast food restaurant. A volunteer homebuilding project competes with a construction company. Granted, Cathedral Buffet was organized to turn a profit (although there is little evidence that the restaurant ever generated revenue for the church). But, as the Court made clear in *Portland Terminal*, what matters is not the object of the enterprise, but instead the purpose of the worker. *Portland Terminal*, 330 U.S. at 152-53.

IV.

Because the district court erred by finding that the church member volunteers were FLSA employees, its judgment must be reversed on that basis. We need not reach Cathedral Buffet's arguments regarding the Free Exercise Clause, *see Bond v. United States*, 134 S. Ct. 2077, 2087 (2014), nor must we address the propriety and scope of the district court's injunction.

REVERSED and REMANDED.

---

**CONCURRENCE**

---

KETHLEDGE, Circuit Judge, concurring.   One hopes that the Department of Labor simply failed to think through its position in this case.  Since initiating this litigation in 2015, the Department has argued, and the district court held, that volunteers at the Cathedral Buffet were in fact employees under the Fair Labor Standards Act—because, the Department says, their pastor spiritually "coerced" them to work there.  That argument's premise—namely, that the Labor Act authorizes the Department to regulate the spiritual dialogue between pastor and congregation—assumes a power whose use would violate the Free Exercise Clause of the First Amendment.

By way of background, the Grace Cathedral Church operated the Cathedral Buffet, a nominally for-profit corporation that in fact never turned a profit, and that the church heavily subsidized (by more than $1 million between 2012-16).  Instead, the record makes clear, the Buffet's purpose was to allow the church's members to proselytize among local residents who dined there.  Although the Buffet had 35 full-time paid employees—all of whom, incidentally, have lost their jobs as a result of this lawsuit, *see* Gov't Br. at 36 & n.13—much of its work was performed by volunteers from the congregation.

In the district court, the Department obtained injunctive relief and about $388,000 in damages on the theory that these congregants were employees (rather than volunteers) under the Act.  Normally that determination is governed by economic criteria: whether the workers are economically dependent upon the defendant, whether the defendant can hire or fire them, whether the defendant substantially controls the terms and conditions of the work.  *See Ellington v. City of East Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012).  Here, per those criteria, the congregants are not employees, as our opinion today makes clear.  But here the Department has divined spiritual criteria as well:  "during Church services[,]" the Department contends, Rev. Angley "exerted undue pressure and influence upon the volunteers" by telling the congregation that a failure to volunteer would be "the same as failing God," and that "God is not pleased" with

congregants who did fail.  Gov't Br. at 40.  Thus, the Department says, putative spiritual coercion can be a stand-alone basis for fines and injunctive relief under the Act.

One can agree that the Reverend's comments were in poor taste, and yet see that the Department has no business regulating them.  For the power that the Department purports to exercise here is out of bounds even under *Employment Div. v. Smith*, 494 U.S. 872 (1990).  There, of course, the Court held that a neutral law of general applicability does not violate the Free Exercise Clause when the law burdens religious exercise only incidentally.  *Id.* at 879.  But here the Department's actions meet none of those criteria.  The Department seeks to regulate spiritual conduct *qua* spiritual conduct, and to impose significant liability as a result.  The very criterion by which the Department would impose liability is expressly spiritual.  Hence this is not a case, like *Smith*, where illegal conduct (there, smoking peyote) remained illegal even though it was religiously motivated.  Instead, the Department's position here is that otherwise *legal* conduct—such as volunteering at a church restaurant—becomes illegal if the worker's pastor spiritually pressures her to engage in it.  (Under this regime, one supposes, whether a pastor can invoke the Book of James—"a person is justified by works and not by faith alone[,]" James 2:24—might be determined on a case-by-case basis.)  The Department's actions therefore "target[] religious conduct for distinctive treatment[,]" *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993); and their burdens upon religious exercise would come by design.

Nor is the Department even competent to make the spiritual judgment it purported to make here.  "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989).  That same idea of centrality perforce lies beneath any judgment about spiritual coercion.  And bureaucrats are no better than judges at making that judgment.  Hence it is beyond the ken of federal agencies, or the courts, to determine that congregants were spiritually coerced even though the congregants themselves say they were not—which is what 134 members of Grace Cathedral said under oath here.

Thus, the coercion that matters is not anything that Rev. Angley said to his congregation on a Sunday morning. What matters, rather, is the Department's own attempt to coerce religious leaders—of any faith—not to exhort their followers on spiritual grounds to engage in conduct that is otherwise legal. For "the Free Exercise Clause protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017) (internal quotation marks omitted). The coercion here would take the form of a check in the amount of $388,507.90, "payable to 'United States Department of Labor—Wage and Hour Division[.]'" Judgment and Order Regarding Injunction at 2. That coercion affects not only Rev. Angley—who along with the Buffet was ordered to pay that amount—but also the congregants themselves; since, even if they return any moneys to Angley or the Buffet, "Defendants shall immediately remit such amount to the U.S. Department of Labor[.]" *Id*. at 3.

What is perhaps most troubling about the Department's position in this case, however, is the conceit of unlimited agency power that lies behind it. The power of a federal agency is no more than worldly. The Department should tend to what is Caesar's, and leave the rest alone.